# EXHIBIT

# B

Jason P. Koch, Esq. – SBN 325156
**THE LAW OFFICE OF JASON P. KOCH**
3 West Carrillo Street, Suite 216
Santa Barbara, CA 93101
Phone: (805) 695-4527
Fax: (805) 695-4528
jason@jasonkochlaw.com

**Electronically FILED by
Superior Court of California,
County of Los Angeles
3/08/2024 11:54 AM
David W. Slayton,
Executive Officer/Clerk of Court,
By G. Molina, Deputy Clerk**

Attorney for Plaintiffs DAVID BROWN;
DB FILM, LLC; FHC FUND 1, LP; HAUNTING, LLC;
THE MAKING OF MOVIE, LLC; UNDERTAKER, LLC;
and, UNTITLED SLA, LLC

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF LOS ANGELES

UNLIMITED CIVIL JURISDICTION

| | |
|---|---|
| DAVID BROWN, an individual; DB FILM, LLC, a Wyoming limited liability company; FHC FUND 1, LP, a California limited partnership; HAUNTING, LLC, a California limited liability company; THE MAKING OF MOVIE, LLC, a California limited liability company; UNDERTAKER, LLC, a California limited liability company; and, UNTITLED SLA, LLC, a California limited liability company,<br><br>          Plaintiffs,<br><br>     vs.<br><br>CHADWICK DARNELL AKA CHAD DARNELL, an individual; MANDRA PICTURES, LLC, a Georgia limited liability company, and DOES 1-50, inclusive,<br><br>          Defendants. | CASE NO.   24VECV01081<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>1. **SLANDER**<br>2. **LIBEL**<br>3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>4. **INTENTIONAL INTERFERENCE WITH CONTRACT**<br>5. **INTENTIONAL INTEREREFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>6. **TRADE LIBEL**<br>7. **UNLAWFUL BUSINESS PRACTICES**<br>8. **BREACH OF CONTRACT**<br>9. **BREACH OF CONTRACT**<br>10. **BREACH OF CONTRACT**<br>11. **BREACH OF CONTRACT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs DAVID BROWN, an individual ("BROWN"), DB FILM, LLC, a Wyoming

limited liability company ("DB FILM"), FHC FUND 1, LP, a California limited partnership ("FHC

FUND"), HAUNTING, LLC, a California limited liability company ("HAUNTING"), THE

MAKING OF MOVIE, LLC, a California limited liability company ("TMOM"), UNDERTAKER,

1

1  LLC, a California limited liability company ("UNDERTAKER"), and UNTITLED SLA, LLC, a
2  California limited liability company ("UNTITLED SLA") (all plaintiffs collectively referred to as
3  "Plaintiffs"), hereby allege as follows:

4  **PARTIES**

5       1.     Plaintiff BROWN, an individual, is and at all times mentioned herein was a resident
6  of the County of Los Angeles, State of California. Among other things, BROWN is a motion picture
7  producer, investor, and the manager of the plaintiffs business entities named below.

8       2.     Plaintiff DB FILM is a Wyoming limited liability company authorized to conduct
9  business in the State of California with its principal place of business located in the County of Los
10 Angeles, State of California.

11      3.     Plaintiff FHC FUND is a California limited liability company with its principal place
12 of business located in the County of Los Angeles, State of California.

13      4.     Plaintiff HAUNTING is a California limited liability company with its principal place
14 of business located in the County of Los Angeles, State of California.

15      5.     Plaintiff TMOM is a California limited liability company with its principal place of
16 business located in the County of Los Angeles, State of California.

17      6.     Plaintiff UNDERTAKER is a California limited liability company with its principal
18 place of business located in the County of Los Angeles, State of California.

19      7.     Plaintiff UNTITLED SLA is a California limited liability company with its principal
20 place of business located in the County of Los Angeles, State of California.

21      8.     Defendant CHADWICK DARNELL AKA CHAD DARNELL ("DARNELL") is an
22 individual residing in the County of Fulton, State of Georgia. Currently, and at all times relevant
23 herein, DARNELL acted with the express and implied authorities as agent, president, and director of
24 MANDRA PICTURES, LLC.

25      9.     Defendant MANDRA PICTURES, LLC ("MANDRA"), is a dissolved Georgia
26 limited liability company. At all times relevant herein, MANDRA operated as the alter ego of
27 Defendant CHADWICK DARNELL. Defendant DARNELL controlled MANDRA PICTURES,
28 LLC, and used the corporate form both unjustly and in derogation of Plaintiffs' interests

10.     The true names and capacities, whether corporate, associate, individual, or otherwise, of Defendants DOES 1 through 50, inclusive, are unknown to Plaintiffs who therefore sue these Defendants by such fictitious names. Plaintiffs allege based upon information and belief, that each of the Defendants designated as a DOES Defendant is in some manner responsible for the events and happenings referred to and caused injuries and damages proximately to the Plaintiffs as alleged herein. Plaintiffs will ask leave of Court to amend this cross-complaint to show their true names and capacities when they have been ascertained.

11.     Plaintiffs are informed and believe and based thereon allege that Defendants DOES 1 through 50, and each of them, were the agent, managing agent, principal, owner, partner, joint venture, successor, representative, servant, employee, and/or co-conspirator of each of the other defendants, and acting within the course and scope of said agency and employment, and that all acts or omissions alleged were duly committed with the ratification, knowledge, permission, authorization, and consent of each defendant.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court under the California Constitution, Article VI, § 10 and Part 2, Title 4 of the Code of Civil Procedure.

13.     Venue is proper in this Court because a binding and enforceable written contract provision provides that actions must be brought in the State of California.

14.     A substantial portion of the events, acts, or omissions giving rise to Plaintiffs' claims for relief against Defendants occurred in the County of Los Angeles, State of California. Defendants have sufficient contacts with the State of California. Based on the above, Defendants are subject to venue in this Court.

## GENERAL ALLEGATIONS

15.     The dispute described in the foregoing arises from a malicious and persistent effort by Defendant Chadwick Darnell and unnamed Doe defendants to inflict reputational and pecuniary harm on Plaintiff David Brown and his business enterprises, which enterprises are also named as plaintiffs to this action. Not only did the defendants seek to cause substantial harm against Plaintiffs

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  by injuring their reputations and business goodwill by disseminating lies and misrepresentations,

2  they did so in clear breach of several contractual agreements to abstain from such conduct.

3        **A.**    **THE PARTIES ENTERED MULTIPLE NON-DISPARAGEMENT AND NON-**

4                  **DISCLOSURE AGREEMENTS**

5        16.    Beginning late in 2019, the parties entered into a series of contracts for the production

6  of two screenplays known as "The Undertaker's Wife" and "The Intelligent." The agreements

7  relevant to this action contain provisions which prohibit disparagement of individuals and entities

8  involved in the production of those movies and disclosure of information concerning the same. The

9  specific agreements are detailed below.

10        **i.**    **Non-Disparagement and Non-Disclosure Agreements Related to**

11            **Production of "The Undertaker's Wife"**

12        **a.**    **The Screenplay Purchase Agreement**

13        17.    On or about December 30, 2019, Plaintiff UNDERTAKER (as the "Producer") and

14  Defendant DARNELL (as the "Owner") executed a contract referred to as Screenplay Purchase

15  Agreement, whereby UNDERTAKER purchased all rights to DARNELL's screenplay entitled "The

16  Undertaker's Wife." DARNELL specifically agreed not to (1) publicize any information, or (2)

17  make any derogatory, knowingly false statements related directly or indirectly to "The Undertaker's

18  Wife" or services to be rendered by others in connection with the production of "The Undertaker's

19  Wife":

20            16. <u>PUBLICITY.</u> Owner [Chadwick Darnell] shall not issue or authorize the

21            publication of any news stories or articles, books or other publicity (including but not limited to blogs and social media networking services) relating directly

22            or indirectly, to the subject matter of this Agreement, the Picture [i.e., the first production of "The Undertaker's Wife"], or the services to be rendered by

23            others in connection with the Picture, or make any derogatory, knowingly false statements relating to the subject matter of this Agreement, the Picture, or the

24            services to rendered by others in connection with the Picture […]

25  A true and correct copy of "The Undertaker's Wife" Screenplay Purchase Agreement is

26  attached hereto as **<u>Exhibit 1</u>** and incorporated herein as though set forth in full.

27  //

28  //

1          **b.    The Director Agreement**

2          18.    On or about December 30, 2019, Plaintiff UNDERTAKER (as the "Company") on

3    the one hand, and Defendant DARNELL (as the "Director") and Defendant MANDRA ("as the

4    Lender") on the other hand, executed a contract referred to as the Director Agreement, whereby

5    MANDRA furnished the services of DARNELL to UNDERTAKER to serve as the director of "The

6    Undertaker's Wife." As with the Screenplay Purchase Agreement, above, DARNELL and

7    MANDRA specifically agreed not to (1) publicize any information, or (2) make any derogatory

8    statements related directly or indirectly to "The Undertaker's Wife" or services to be rendered by

9    others in connection with the production of "The Undertaker's Wife":

10               18. CONFIDENTIALITY. Lender [MANDRA] and Director [DARNELL]
                 may not issue, release, authorize or in any way participate in any publicity, press
11               releases, advertisements or promotional activities relating to Company
                 [UNDERTAKER]or the Picture ["The Undertaker's Wife"] without the prior
12               written consent of Company. No publicity issued by Lender or Director shall
                 contain derogatory mention of Company or the Picture, or the services of any
13               person in connection with the Picture. Lender and Director shall not disclose to
                 any third party any confidential information with respect to Company or the
14               Picture, except if required by law or to representatives and/or for quote
                 purposes. Lender and Director further agree that Lender and Director will not
15               divulge or make known to any person or entity any matters of a confidential
                 nature pertaining to Company's business, except if required by law, by court
16               order or to representatives. For the avoidance of doubt, Lender and Director's
                 confidentiality and publicity restrictions hereunder shall apply to any and all
17               media whatsoever, including, without limitation, any social networking site,
                 micro-blogging service, online forum, personal website or blog, or user-
18               generated or user-uploaded content website (e.g., Facebook, Twitter, Google+,
                 Instagram, etc.).
19

20   A true and correct copy of "The Undertaker's Wife" Director Agreement is attached hereto as

21   **Exhibit 2** and incorporated herein as though set forth in full.

22          **ii.    Non-Disparagement and Non-Disclosure Agreements Related to**

23                **Production of "The Intelligent"**

24          19.    Nearly identical contracts were executed for the production of the movie entitled

25   "The Intelligent," with the same provisions to prohibit non-disparagement and non-disclosure by

26   Defendants.

27   / /

28   / /

### a.  Screenplay Purchase Agreement

20.     On or about February 13, 2021, Plaintiff DB FILM (as the "Producer") and Defendant DARNELL (as the "Owner") executed a contract referred to as Screenplay Purchase Agreement, whereby DB FILM purchased all rights to DARNELL's screenplay entitled "The Intelligent." DARNELL specifically agreed not to (1) publicize any information, or (2) make any derogatory, knowingly false statements related directly or indirectly to "The Intelligent" or services to be rendered by others in connection with the production of "The Intelligent":

> 16. PUBLICITY. Owner [Chadwick Darnell] shall not issue or authorize the publication of any news stories or articles, books or other publicity (including but not limited to blogs and social media networking services) relating directly or indirectly, to the subject matter of this Agreement, the Picture [i.e., the first production of "The Intelligent"], or the services to be rendered by others in connection with the Picture, or make any derogatory, knowingly false statements relating to the subject matter of this Agreement, the Picture, or the services to rendered by others in connection with the Picture […]

A true and correct copy of "The Intelligent" Screenplay Purchase Agreement is attached hereto as **Exhibit 3** and incorporated herein as though set forth in full.

### b.  Director Agreement

21.     On or about August 11, 2021, Plaintiff HAUNTING (as the "Company") on the one hand, and Defendant DARNELL (as the "Director") and Defendant MANDRA ("as the Lender") on the other hand, executed a contract referred to as the Director Agreement, whereby MANDRA furnished the services of DARNELL to HAUNTING to serve as the director of "The Intelligent." As with the Screenplay Purchase Agreement, above, DARNELL and MANDRA specifically agreed not to (1) publicize any information, or (2) make any derogatory statements related directly or indirectly to "The Intelligent" or services to be rendered by others in connection with the production of "The Intelligent":

> 18.   LIMITATION   ON   PUBLICITY/CONFIDENTIALITY.   Director [DARNELL] hereby acknowledges and agrees that Director shall not directly or indirectly issue or permit the issuance of any publicity or disclose any information concerning this Agreement, Director's engagement services under this Agreement, the results and proceeds of Director's services under this Agreement, the Picture ["The Intelligent"], Company [HAUNTING], or Company's business or production methods; provided, however, that Director is not in breach of this provision if: (i) Director discloses any such information to Director's representatives; or (ii) Director is compelled to do so in connection

with a legal proceeding or to enforce this Agreement. For the avoidance of doubt, Director's confidentiality and publicity restrictions hereunder shall apply to any and all media whatsoever, including, without limitation, any social networking site, micro-blogging service, online forum, personal website or blog, or user-generated or user-uploaded content website (e.g., Facebook, Twitter, Google+, Snapchat, Instagram, etc.). Notwithstanding the foregoing, Director shall be permitted to make incidental, non-derogatory references to Director's involvement in the Picture in Director's personal publicity following the initial Company authorized press release for the Picture.

A true and correct copy of "The Intelligent" Director Agreement is attached hereto as **Exhibit 4** and incorporated herein as though set forth in full.

**B.     DARNELL AND DOES 1-50 SAVAGED PLAINTIFFS' REPUTATIONS IN THE *LOS ANGELES TIMES* AND ON SOCIAL MEDIA**

22.     Despite the above-referenced contractual agreements not to disparage, defame, and/or publicly disclose information about Plaintiffs, DARNELL and DOES 1-50 launched a deliberate campaign to destroy their reputations by accusing BROWN (and by association his business enterprises) of defrauding him. DARNELL and DOES 1-50 provided information to the *Los Angeles Times* for a purported exposé (the "Article") which falsely cast BROWN as a Hollywood con artist engaged in routine embezzlement, self-dealing, and fraud who predated on naïve movie upstarts like DARNELL. In anticipation of the Article's publication, DARNELL and DOES 1-50 began to promote its debut. DARNELL and DOES 1-50 sent messages to the producer of BROWN's podcast, *The David Brown Podcast*, to pressure him to leave the show based on false allegations similar to those he fed to the *Los Angeles Times*. In fact, DARNELL and DOES 1-50 told the producer to BROWN would soon be "taken down" by the Article. DARNELL and DOES 1-50 proceeded to build on the hype generated vis-à-vis the Article; they published scathing falsehoods on Facebook Threads, X (formerly Twitter), and, based on information and belief, on other social media platforms. The specific statements made or published by, or otherwise attributed to, DARNELL and DOES 1-50 are set forth below.

/ /

/ /

/ /

/ /

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

i.     **The *Los Angeles Times* Article**

23.     On May 16, 2023[1], the *Los Angeles Times* published the above-referenced Article about BROWN, which prominently featured the contributions of DARNELL's false and misleading statements about BROWN and his business enterprises (i.e., the Plaintiffs). Every statement below provided by or otherwise attributed to DARNELL in the Article is untrue, defamatory, and/or misleading:

a.     "Darnell shot ['The Undertaker's Wife'] in early 2020, but it was never sold or released because of disputes Brown had with investors."

b.     "Darnell had no idea that there had been any financial issues on "The Undertaker's Wife" until he was informed by The Times."

c.     "But Darnell said Brown continually delayed the shooting for almost three years while stringing the director and cast members along."

d.     "In January, 10 days before the start of filming for 'Intelligent,' agents and managers for lead actors Matthew Daddario and Katherine McNamara were asking for escrow, a common holding fee that actors receive before production. But Brown never sent it to the actors, Darnell said."

e.     "Because of this, the managers and agents pulled their talent from the film, Darnell said."

f.     "Darnell said that his experience on 'Untitled SLA' was excruciating and that he also wasn't paid what he was owed for casting and working as a producer before the project fell apart."

g.     "After 'Untitled SLA' fell through, [DARNELL] said, he finally realized he couldn't work with Brown."

h.     " 'I believed him,' Darnell said. 'I absolutely believed him. And he betrayed that trust.' "

---

[1] Goldberg, N. (2023, May 16) A Hollywood producer says he makes 'dreams come true.' But fraud allegations dog him. *Los Angeles Times.* https://www.latimes.com/entertainment-arts/business/story/2023-05-16/hollywood-producer-fraud-kevin-spacey-david-duchovny-david-brown

8

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

(See **Exhibit 5**, which is a true and correct copy of the Article as published online by the *Los Angeles Times*.)

24.   DARNELL and DOES 1-50 monitored the online version of the Article long enough to heap still more baseless scorn and ridicule on BROWN as judged from the below-listed replies to comments posted by readers:

a.   "I mean, I've been in the industry for over 30 years and spent 16 in Los Angeles[;] and [David Brown] conned many, many people, but got off, bruh,. [sic]"

b.   "I'm 99.99% sure if the producer at Paramount responded to email [sic], I would learn ['Intelligent'] never had a deal at Paramount."

c.   "I didn't [G]oogle 'David Brown' and the words 'Film' and 'Lawsuit' until two days after I had to kill ['Intelligent']. Things didn't add up on ['Untitled SLA']. But I trust[ed] him. I needed to trust him."

d.   "And [David Brown] has been threatening me with lawsuits for the past 24 hours for speaking to his story and (allegedly) pretending to be a process server over text."

e.   "[David Brown] ruined my life."

(See **Exhibit 5**.)

**ii.   Messages Sent on Facebook to the Producer of the *David Brown Podcast***

25.   In or around April 2023, shortly before the *Los Angeles Times* published the Article, DARNELL and DOES 1-50 sent a series of messages to the producer (the "Producer") of the *David Brown Podcast* (the "Podcast") on Facebook. The messages by DARNELL and DOES 1-50 are attached hereto as **Exhibit 6**. The name of the recipient has been redacted. In all other respects the exhibit is a true and correct copy of such messages.

26.   In the messages, DARNELL and DOES 1-50 told the Producer that BROWN is a "con artist…about to be taken down in the [*Los Angeles Times*] Anna Delvey[2] style," and that

---

[2] "Anna Sorokin, also known as Anna Delvey, is a con artist and fraudster who posed as a wealthy heiress to access upper-class New York social and art scenes from 2013 to 2017. […] Netflix paid Sorokin $320,000 for the rights to her story and developed it into the 2022 miniseries Inventing Anna. Sorokin's life story has been the subject of multiple other television shows, interviews, podcasts, and theater productions." Wikipedia, the Free Encyclopedia, Anna Sorokin, at https://en.wikipedia.org/wiki/Anna_Sorokin (last visited Feb. 28, 2024).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1 DARNELL and DOES 1-50 "trusted him implicitly for years […] then realized he was a con artist."

2 (**Exhibit 6**.) DARNELL and DOES 1-50 further claimed that BROWN stole "thousands and

3 millions of dollars from every production he has touched." (*Ibid*.) DARNELL and DOES 1-50

4 encouraged the Producer to search BROWN and "Bucky F*cking Dent,"[3] and implied the search

5 result would yield proof that BROWN "stole $680k from [that project]." (*Ibid*.) DARNELL and

6 DOES 1-50 additionally claimed that BROWN "stole $3M on 'The Collected'…[,] half a million on

7 [DARNELL's] film," and that he "forged Kevin Spacey's signature" for the unproduced "Triumph"

8 project. (*Ibid*.) DARNELL and DOES 1-50 invited the Producer to search a website known as "Who

9 Scammed Me" (www.whoscammedme.com) and wrote that BROWN would blame one of his

10 deceased friends, from whom DARNELL and DOES 1-50 falsely alleged BROWN "stole [more

11 than] $83k." (*Ibid*.)

12      27.    In a clear effort to disrupt BROWN's Podcast and relationship with the Producer,

13 DARNELL and DOES 1-50 falsely asserted that BROWN "[was] using [the Producer]," and "used

14 [DARNELL]." (*Ibid*.) DARNELL and DOES 1-50 referred the Producer to DARNELL'S own false

15 and misleading statements in the Article by the *Los Angeles Times* to support the conclusion that the

16 Producer should leave the Podcast "while [he] still can. […] Run." (*Ibid*.) "This will not end well for

17 [BROWN]." (*Ibid*.)

18      **iii.**      **Messages Posted on Facebook Threads**

19      28.    In or around May 2023, after the Article appeared in the *Los Angeles Times*,

20 DARNELL and DOES 1-50 published additional defamatory comments about Plaintiffs on

21 Facebook Threads:

22      a.      "The producer [BROWN]? He threatened to sue me after I helped the [*Los*

23          *Angeles Times*] with a front[-]page story exposing his (ALLEGED) years of fraud."

24 */ /*

25 */ /*

26

27 ─────────────────────

[3] " 'Bucky F*cking Dent' is a 2016 novel by actor David Duchovny which focuses on a father-son

28 relationship and baseball." Wikipedia, the Free Encyclopedia, Bucky F*cking Dent, at
https://en.wikipedia.org/wiki/Bucky_F*cking_Dent (last visited Feb. 28, 2024).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

b.      "10 days from shooting ["The Intelligent"], I found out the producer was a con artist. […] Not just a small con artist. Like A BIG con artist. [BROWN] had stolen MILLIONS of dollars from nearly a half[-]dozen projects."

c.      "I realized my first film ["The Undertaker's Wife"] will most probably never see the light of day because [BROWN] stole nearly half a million dollars from my investor."

29.    True and correct copies of the Facebook Threads comments published by DARNELL and DOES 1-50 are attached hereto as **Exhibit 7**.

        **iv.      Messages Posted on Twitter (now "X")**

30.    In or around May 2023, after the Article appeared in the *Los Angeles Times*, DARNELL and DOES 1-50 promoted the Article in another defamatory post about BROWN on X.com (formerly Twitter): "This is the guy [referring to BROWN and the Article] who ruined the last 3+ years of my life. This is the guy I want buried under a prison." The statement that BROWN ruined DARNELL's life is patently false. A true and correct copy of the X/Twitter comment published by DARNELL and DOES 1-50 is attached hereto as **Exhibit 8**.

    **C.      DEFENDANTS DISPUTED SEVERAL BUSINESS RELATIONSHIPS THROUGH THEIR SUSTAINED PUBLIC DEFAMATION CAMPAIGN**

31.    Plaintiff BROWN manages multiple limited liability companies which are involved in investment activities, motion picture production, and lending. Many valuable business relationships broke down when the Article was discovered by prospective and actual business partners who conducted routine due diligence on BROWN.

32.    An unproduced film project called "Untitled SLA" was in production when the Article was published. Investors pulled out of the production because of the allegations by DARNELL and DOES 1-50 that BROWN and his businesses regularly engaged in fraud, theft, embezzlement, and similar conduct. Every contract with every actor, crew member, and other persons retained to work on "Untitled SLA" that was escrowed by BROWN was terminated, which caused the loss of approximately $700,000 to BROWN.

33.    Plaintiff FHC FUND, which is managed by BROWN, loans money to motion picture projects. FHC FUND earns a 2% management fee and 20% of net profits from financing motion

1   pictures. FHC FUND and BROWN lost two important business relationships with securities brokers

2   as a direct result of the Article, which was discovered by the securities brokers as a part of routine

3   due diligence. The cost of losing those relationships is estimated at $1,000,000.00 per year.

4        34.     Plaintiffs TMOM lost literary rights to a film project entitled "The Confined," which

5   BROWN was going to produce. The arrangement would have yielded a $100,000.00 fee to BROWN

6   as producer, and 50% of the distribution profits, estimated at an additional $100,000.00. Plaintiffs

7   TMOM and BROWN were unable to proceed with "The Confined" after investors learned of the

8   Article and the false allegations by DARNELL and DOES 1-50.

9        35.     Similarly, *The David Brown Podcast* was cancelled as a direct result of the

10   defamatory messages sent to the Podcast's Producer by DARNELL and DOES 1-50.

11        36.     Combined, Plaintiffs lost business opportunities worth millions of dollars as a result

12   of the defamation campaign by DARNELL and DOES 1-50.

13   **FIRST CAUSE OF ACTION**

14   **SLANDER PER SE**

15   (By Plaintiff BROWN Against Defendants DARNELL and DOES 1-50)

16        37.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1

17   through 36, inclusive, as though fully set forth at length herein.

18        38.     At a date uncertain prior to publication of the Article by the *Los Angeles Times*, but

19   on information and belief just prior to May 16, 2023, Plaintiff alleges that Defendant DARNELL

20   and DOES 1-50 made false and defamatory statements regarding Plaintiff as alleged above. The

21   statements are alleged with specificity above and attached as **Exhibit 5** hereto and incorporated by

22   reference as though fully set forth herein.

23        39.     Plaintiff further alleges that DARNELL and DOES 1-50 knew that such statements

24   were false at the time they were made. The statements were made with malice and intent to injure

25   BROWN and his business enterprises, including but not limited to Plaintiffs DB FILM,

26   HAUNTING, and UNDERTAKER.

27        40.     The statements were made to a reporter for the *Los Angeles Times* and were

28   subsequently published to a worldwide readership both in print and on the internet.

41. The statements were slanderous per se because they accused Plaintiffs of fraud, theft, dishonesty, and subjected them to contempt and ridicule.

42. The statements given by Defendants were understood by those who saw and heard them in a way that defamed Plaintiffs because they were reported by a major newspaper as if they were factually correct allegations of fraud, theft, and dishonesty.

43. As a result of the above-described words, Plaintiffs have suffered general damages to their reputations and lost income.

44. The above-described words were spoken by Defendants with malice, oppression, and/or fraud in that DARNELL and DOES 1-50 sought to inflict financial harm upon Plaintiffs and to subject them to ridicule, contempt, scorn, and general reputational harm. Accordingly, an award of exemplary and punitive damages is justified.

## SECOND CAUSE OF ACTION

### LIBEL

(By Plaintiff BROWN Against Defendants DARNELL and DOES 1-50)

45. Plaintiffs reallege and replead each and every allegation contained in paragraphs 1 through 44, inclusive, as though fully set forth at length herein.

46. From approximately April 2023 and continuing for a time yet uncertain, DARNELL and DOES 1-50 published online messages and statements as alleged in Section B, *supra*, and attached hereto as **Exhibits 6, 7, and 8**, and made a part hereof.

47. Such publications were made of and concerning BROWN, and by association his business enterprises, and were so understood by those who read the publications.

48. The entirety of the messages and statements are false as they pertain to BROWN.

49. The material published by DARNELL and DOES 1-50, as alleged above, is libelous on its face. It clearly expose Plaintiffs to hatred, contempt, ridicule, and obloquy because the material accuses Plaintiffs of fraud, theft, embezzlement, and other conduct of a similar nature.

50. These messages were seen and read by a worldwide internet audience.

51. As a proximate result of the above-described publications, BROWN has suffered loss of his reputation, shame, mortification, and hurt feelings all to his general damage.

13

1     52.     As a further proximate result of the above-described publications, BROWN has

2    suffered the special damages by way of injury to his business, trade, profession, and occupation,

3    including lost business opportunities and business relationships.

4     53.     The above-described words were spoken by Defendants with malice, oppression,

5    and/or fraud in that DARNELL and DOES 1-50 sought to inflict financial harm upon Plaintiffs and

6    to subject them to ridicule, contempt, scorn, and general reputational harm. Accordingly, an award

7    of exemplary and punitive damages is justified.

8    **THIRD CAUSE OF ACTION**

9    **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

10    (By Plaintiff BROWN Against Defendants DARNELL and DOES 1-50)

11     54.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1

12    through 53, inclusive, as though fully set forth at length herein.

13     55.     As alleged above, beginning in or around April 2023, Defendants, and each of them,

14    campaigned to cause severe harm to BROWN's reputation and his business interests via multiple

15    online channels and print media.

16     56.     The conduct of DARNELL and DOES 1-50 was intentional and malicious and done

17    for the purpose of causing BROWN to suffer humiliation, mental anguish, and emotional and

18    physical distress, all in breach of contractual arrangements with Plaintiffs, at least as to the named

19    defendants. DARNELL's and DOES' 1-50 conduct of spreading vicious lies in effort to destroy

20    BROWN's reputation was done with knowledge that BROWN's emotional and physical distress

21    would thereby increase, and was done with a wanton and reckless disregard of the consequences to

22    BROWN.

23     57.     As the proximate result of the acts alleged above, BROWN suffered humiliation,

24    mental anguish, and emotional and physical distress, and has been injured in mind and body

25    including but limited to depression, anxiety, horror, fright, humiliation, sleeplessness, fatigue,

26    feelings of helplessness and hopelessness, grief, shame, embarrassment, anger, chagrin,

27    disappointment, worry, loss of interest in daily activities, difficulty eating, headaches, stomach pains,

28    and nausea, all to BROWN's damage.

14

58.     As a further proximate result of the acts alleged above, BROWN was required to and did employ physicians and other medical experts to examine, treat, and care for BROWN, and incurred additional medical expenses for hospital bills (and other incidental medical expenses). BROWN is informed and believes and thereon alleges that he will incur some additional medical expenses, the exact amount of which is unknown.

59.     The acts of Defendants alleged above were willful, wanton, malicious, and oppressive, and justify the awarding of exemplary and punitive damages.

## FOURTH CAUSE OF ACTION

### INTENTIONAL INTERFERENCE WITH CONTRACT

(By Plaintiffs BROWN, DB FILM, UNTITLED SLA, and TMOM Against Defendants DARNELL and DOES 1-50)

60.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1 through 59, inclusive, as though fully set forth at length herein.

61.     Plaintiffs allege on information and believe that DARNELL and DOES 1-50, have willfully and deliberately committed the wrongful acts alleged herein with the intent to interfere with the contractual relations between Plaintiffs and their employees, clients, contractors, and/or investors.

62.     As a proximate result of such wrongful acts, Plaintiffs have suffered injury and damage to their business and goodwill in an amount to conform to proof at trial, but in no event less than the jurisdictional minimum of this Court.

63.     Plaintiffs are informed and believe, and thereon allege, that the acts of DARNELL and DOES 1-50, in interfering with Plaintiffs' contractual relations with their employees, clients, and suppliers were willful and malicious and designed to obstruct and otherwise interfere with the successful operation of Plaintiffs businesses. Plaintiffs therefore are entitled to recover exemplary and punitive damages in a sum sufficient to punish said defendants.

/ /

/ /

/ /

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

**FIFTH CAUSE OF ACTION**

2

**INTENTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

3

(By Plaintiffs BROWN, DB FILM, and FHC FUND Against Defendants DARNELL and DOES 1-

4

50)

5

      64.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1

6

through 63, inclusive, as though fully set forth at length herein.

7

      65.     Plaintiffs allege on information and belief that DARNELL and DOES 1-50, willfully

8

and deliberately committed the wrongful acts alleged herein with the intent to harm Plaintiffs

9

financially and to induce Plaintiffs' existing employees, clients, prospective clients, and investors to

10

sever their present and prospective business relationships with Plaintiffs.

11

      66.     As a proximate result of such wrongful acts, Plaintiffs have suffered injury and

12

damage to their business and goodwill in an amount to conform to proof at trial, but in no event less

13

than the jurisdictional minimum of this Court.

14

      67.     Plaintiffs are informed and believe, and thereon allege, that the acts of DARNELL

15

and DOES 1-50, in interfering with Plaintiffs' business relationships as described herein were willful

16

and malicious and designed to obstruct and otherwise interfere with the successful operation of

17

Plaintiffs' business. Plaintiffs therefore are entitled to recover exemplary and punitive damages in a

18

sum sufficient to punish DARNELL and DOES 1-50.

19

**SIXTH CAUSE OF ACTION**

20

**TRADE LIBEL**

21

(By All Plaintiffs Against Defendants DARNELL and DOES 1-50)

22

      68.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1

23

through __, inclusive, as though fully set forth at length herein.

24

      69.     Plaintiffs are informed and believe and thereon allege that DARNELL and DOES 1-

25

50, and each of them, have made false and defamatory statements regarding Plaintiffs' products and

26

services and that DARNELL and DOES 1-50 knew such statements were false at the time they were

27

made. The statements were made with malice and intent to injure Plaintiffs' business and business

28

reputation.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  70.    As a result of such trade libel, Plaintiffs have suffered injury and damage to their

2  business and goodwill in an amount to conform to proof at time of trial, but in no event less than the

3  jurisdictional minimum of this Court.

4  71.    Because the actions of DARNELL and DOES 1-50 were committed with malice and

5  intent to injure, Plaintiffs are entitled to exemplary and punitive damages in a sum appropriate to

6  punish such defendants.

7  **SEVENTH CAUSE OF ACTION**

8  **UNFAIR COMPETITION IN VIOLATION OF BUS. & PROF. CODE § 17200**

9  (By All Plaintiffs Against All Defendants)

10  72.    Plaintiffs reallege and replead each and every allegation contained in paragraphs 1

11  through 71, inclusive, as though fully set forth at length herein.

12  73.    Plaintiffs are informed and believe and on that basis thereon allege, the above-alleged

13  defamatory statements and publications by DARNELL, individually and as the manager of his alter

14  ego film production company MANDRA, and DOES 1-50 constitute unlawful, unfair, and/or

15  fraudulent business practices in violation of Section 17200 et seq. of the California Business and

16  Professions Code and California common law.

17  74.    As a direct and proximate result of Defendants' wrongful acts, Plaintiffs have suffered

18  and will continue to suffer substantial pecuniary losses and irreparable injury to their business

19  reputation and goodwill. As such, Plaintiffs' remedy at law is not adequate to compensate for

20  injuries inflicted by Defendants. Accordingly, Plaintiffs are entitled to preliminary and permanent

21  injunctive relief.

22  75.    By reason of such wrongful acts, Plaintiffs are and were, and will be in the future,

23  deprived of the profits and benefits of said business relationships, agreements, and transactions with

24  various existing employees, clients, prospective clients, investors, prospective investors, and/or

25  supplier.

26  //

27  //

28  //

17

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1

**EIGHTH CAUSE OF ACTION**

2

**BREACH OF CONTRACT**

3

(By Plaintiffs BROWN, DB FILM, and UNDERTAKER Against Defendant DARNELL)

4

76.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1

5

through 75, inclusive, as though fully set forth at length herein.

6

77.     Plaintiff UNDERTAKER has at all times performed the terms of the contract in the

7

manner specified by the contract.

8

78.     Plaintiffs BROWN and DB FILM are third-party beneficiaries of the contract,

9

specifically protected by the contract's non-disparagement and non-disclosure terms.

10

79.     Defendant DARNELL has failed and refused, and continues to refuse, to tender his

11

performance as required by the contract's non-disparagement and non-disclosure provisions as such

12

terms relate to Plaintiffs. Defendant breached the contract beginning in or around April 2023,

13

causing permanent harm to the reputations of BROWN, DB FILM, and UNDERTAKER when

14

DARNELL and DOES 1-50 engaged in a sustained campaign to defame Plaintiffs as alleged above.

15

80.     Defendant's failure and refusal to perform his obligations under the contract by

16

refraining from prohibited disparagement and disclosure has directly damaged Plaintiffs through

17

harm to their reputations and goodwill. Further, Defendant's breach of contract has caused Plaintiffs

18

BROWN and DB FILM to lose the benefit of the $700,000 invested to produce the motion picture

19

"Untitled SLA." In addition, Plaintiffs BROWN and DB Film have been damaged in an amount

20

according to proof for the multitude of lost business opportunities as a result of Defendant's failure

21

to fulfill his obligations under the contract.

22

**NINTH CAUSE OF ACTION**

23

**BREACH OF CONTRACT**

24

(By Plaintiffs BROWN, DB FILM, and UNDERTAKER Against Defendants DARNELL and

25

MANDRA)

26

81.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1

27

through 80, inclusive, as though fully set forth at length herein.

28

18

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

82.     Plaintiff UNDERTAKER has at all times performed the terms of the contract in the manner specified by the contract.

83.     Plaintiffs BROWN and DB FILM are third-party beneficiaries of the contract, specifically protected by the contract's non-disparagement and non-disclosure terms.

84.     Defendant DARNELL and his alter ego MANDRA have failed and refused, and continues to refuse, to tender performance as required by the contract's non-disparagement and non-disclosure provisions as such terms relate to Plaintiffs. Defendants breached the contract beginning in or around April 2023, causing permanent harm to the reputations of BROWN, DB FILM, and UNDERTAKER when DARNELL and DOES 1-50 engaged in a sustained campaign to defame Plaintiffs as alleged above.

85.     Defendants' failure and refusal to perform their obligations under the contract by refraining from prohibited disparagement and disclosure has directly damaged Plaintiffs through harm to their reputations and goodwill. Further, Defendant's breach of contract has caused Plaintiffs BROWN and DB FILM to lose the benefit of the $700,000 invested to produce the motion picture "Untitled SLA." In addition, Plaintiffs BROWN and DB Film have been damaged in an amount according to proof for the multitude of lost business opportunities as a result of Defendants' failure to fulfill his obligations under the contract.

## TENTH CAUSE OF ACTION

### BREACH OF CONTRACT

(By Plaintiffs BROWN and DB FILM Against Defendant DARNELL)

86.     Plaintiffs reallege and replead each and every allegation contained in paragraphs 1 through 85, inclusive, as though fully set forth at length herein.

87.     Plaintiff DB FILM has at all times performed the terms of the contract in the manner specified by the contract.

88.     Plaintiff BROWN is a third-party beneficiary of the contract, specifically protected by the contract's non-disparagement and non-disclosure terms.

89.     Defendant DARNELL and his alter ego MANDRA have failed and refused, and continues to refuse, to tender performance as required by the contract's non-disparagement and non-

19

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1  disclosure provisions as such terms relate to Plaintiffs. Defendants breached the contract beginning

2  in or around April 2023, causing permanent harm to the reputations of BROWN and DB FILM when

3  DARNELL and DOES 1-50 engaged in a sustained campaign to defame Plaintiffs as alleged above.

4    90.    Defendants' failure and refusal to perform their obligations under the contract by

5  refraining from prohibited disparagement and disclosure has directly damaged Plaintiffs through

6  harm to their reputations and goodwill. Further, Defendant's breach of contract has caused Plaintiffs

7  BROWN and DB FILM to lose the benefit of the $700,000 invested to produce the motion picture

8  "Untitled SLA." In addition, Plaintiffs BROWN and DB Film have been damaged in an amount

9  according to proof for the multitude of lost business opportunities as a result of Defendants' failure

10  to fulfill his obligations under the contract.

11                              **ELEVENTH CAUSE OF ACTION**

12                                  **BREACH OF CONTRACT**

13              (By Plaintiff HAUNTING Against Defendants DARNELL and MANDRA)

14    91.    Plaintiffs reallege and replead each and every allegation contained in paragraphs 1

15  through 90, inclusive, as though fully set forth at length herein.

16    92.    Plaintiff HAUNTING has at all times performed the terms of the contract in the

17  manner specified by the contract.

18    93.    Plaintiffs BROWN and DB FILM are third-party beneficiaries of the contract,

19  specifically protected by the contract's non-disparagement and non-disclosure terms.

20    94.    Defendant DARNELL and his alter ego MANDRA have failed and refused, and

21  continues to refuse, to tender performance as required by the contract's non-disparagement and non-

22  disclosure provisions as such terms relate to Plaintiffs. Defendants breached the contract beginning

23  in or around April 2023, causing permanent harm to the reputations of BROWN, DB FILM, and

24  HAUNTING when DARNELL and DOES 1-50 engaged in a sustained campaign to defame

25  Plaintiffs as alleged above.

26    95.    Defendants' failure and refusal to perform their obligations under the contract by

27  refraining from prohibited disparagement and disclosure has directly damaged Plaintiffs through

28  harm to their reputations and goodwill. Further, Defendant's breach of contract has caused Plaintiffs

1  BROWN and DB FILM to lose the benefit of the $700,000 invested to produce the motion picture

2  "Untitled SLA." In addition, Plaintiffs BROWN and DB Film have been damaged in an amount

3  according to proof for the multitude of lost business opportunities as a result of Defendants' failure

4  to fulfill his obligations under the contract.

5                                   **DEMAND FOR JURY TRIAL**

6        Plaintiffs hereby demand a jury trial.

7                                   **PRAYER FOR RELIEF**

8        WHEREFORE, Plaintiffs pray judgment against Defendants, and each of them, as follows:

9        As to the First, Second, Fourth, Fifth, and Sixth Causes of Action:

10       1.      For general damages according to proof;

11       2.      For medical and related expenses according to proof;

12       3.      For lost earnings, past and future, according to proof;

13       4.      For exemplary and punitive damages;

14       5.      For costs of suit herein incurred; and

15       6.      For such other and further relief as the court may deem just and proper.

16       As to the Third Cause of Action:

17       1.      For general damages according to proof;

18       2.      For special damages according to proof;

19       3.      For costs of suit incurred herein;

20       4.      For punitive damages; and

21       5.      For such other and further relief as the court may deem just and proper.

22       As to the Seventh Cause of Action:

23       1.      For general damages according to proof;

24       2.      For preliminary injunctive relief;

25       3.      For permanent injunctive relief;

26       4.      For costs of suit herein incurred; and

27       5.      For such other and further relief as the court may deem just and proper.

28  //

---

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1     <u>As to the Eighth through Eleventh Causes of Action:</u>

2     1.    For compensatory damages according to proof;

3     2.    For reasonable attorney's fees according to proof;

4     3.    For costs of suit incurred herein; and

5     4.    For such other and further relief as the court may deem just and proper.

6

7 DATED: March 5, 2024           **THE LAW OFFICE OF JASON P. KOCH**

8

9           By: _____

10           Jason P. Koch
          Attorney for Plaintiffs DAVID BROWN;

11           DB FILM, LLC; FHC FUND 1, LP;
          HAUNTING, LLC;

12           THE MAKING OF MOVIE, LLC;
          UNDERTAKER, LLC;

13           and, UNTITLED SLA, LLC

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

# EXHIBIT 1

DocuSign Envelope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

# Screenplay Purchase Agreement

### *THE UNDERTAKER'S WIFE*

This agreement ("Agreement") is made and entered into as of December 30, 2019 ("Effective Date"), by and between Undertaker LLC ("Producer") and Chadwick Darnell ("Owner") with respect to the unpublished, unexploited original screenplay entitled "The Undertaker's Wife" written by Owner. Such work, and the title, themes, stories, dialogue and all of the other contents thereof, and the characters therein, and all translations, adaptations, and versions thereof, whether now existing or hereafter created, are herein referred to collectively as the "Property". The first production based on the Property and produced pursuant to the rights granted herein shall be referred to as the "Picture". The parties hereto agree as follows:

1.    <u>CONDITIONS PRECEDENT</u>.    All of Owner's obligations hereunder are subject to Producer's payment to Owner of all non-contingent compensation and/or fees owed to Owner hereunder. All of Producer's obligations hereunder are subject to satisfaction of the following conditions precedent ("Conditions Precedent"):

    a.    Signature by Owner and delivery to Producer of this Agreement;

    b.    Signature by Owner and delivery to Producer of the Short Form Assignment (attached hereto as Exhibit A).

    c.    Clear chain of title for the Picture in form and substance satisfactory to Producer in its sole discretion.

2.    <u>PURCHASE PRICE</u>. Owner hereby grants, sells and assigns to Producer all rights in the Property. Upon commencement of principal photography of the Picture, Producer shall pay Owner as full and complete consideration for all rights granted by Owner hereunder (including, without limitation, the Rights as defined in Section 4 below) and the promises, representations and warranties made by Owner, a sum of One United States Dollars ($1.00) (the "Purchase Price").

3.    <u>GRANT OF RIGHTS</u>. Owner hereby sells, grants, conveys and assigns to Producer exclusively and irrevocably in perpetuity and throughout the universe, all right, title and interest of every kind and nature, in and to the Property (and all marketing rights relating thereto) without reservation, claim or retained rights of any kind by Owner (all of the foregoing being collectively referred to as the "Rights"). Owner shall retain no rights of any kind or nature to the Property. Without limiting the generality of the foregoing, the Rights in the Property herein granted include:

    (a)    <u>Droit Moral/Rental and Lending Rights</u>: The right to change, add to, delete, take from, translate or otherwise modify the Property in any manner Producer may in its own discretion determine. Owner hereby waives the benefit of any provision of law known as "droit moral" or moral rights of authors or any similar or analogous law or decision in any country of the world. Owner, on Owner's own behalf and on behalf of Owner's successors-in-interest, heirs, executors, administrators and assigns hereby assign to Producer in perpetuity all rental and lending rights under national laws (whether implemented pursuant to the EC Rental and Lending Rights Directive or otherwise) to which Owner may now be or hereafter may become

DocuSign Envelope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

entitled therefrom.  Owner agrees, on Owner's own behalf and on behalf of Owner's successors-in-interest, heirs, executors, administrators and assigns, not to institute, support, maintain or permit, directly or indirectly, any litigation or proceedings instituted or maintained on the ground that Producer's (or its designee's) exercise of the right granted to Producer in the Picture in any way constitutes an infringement or violation of any such rental or lending right as aforesaid.  Owner hereby acknowledges that the consideration to which Producer is entitled pursuant to this Agreement includes consideration for the assignment of rental and lending rights provided for in this paragraph and that such consideration is an equitable and adequate part of the revenues derived or to be derived by Producer from such rights.  Further, if under any applicable law the above waiver or assignment by Owner of "moral rights" or "droit moral" is not effective, then Owner agrees to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

(b)     <u>Name and Likeness</u>: Subject to the terms of this Paragraph, Producer shall have the right to use and permit others to use Owner's approved name, photograph, likeness and biography in connection with advertising, publicizing and exploiting Producer and the Picture and any allied and ancillary rights therein in all media now known or hereafter devised and in any manner, in segments or otherwise, at Producer's sole discretion, provided that Owner will not be represented as endorsing any such commodity, product, or service other than the Picture without Owner's prior consent (provided, however, that Producer shall not be required to obtain Owner's prior consent for the use of Owner's name in the billing block). Owner shall have the right to submit to Producer a written biography and photographic likeness of Owner within five (5) business days, reducible to two (2) business days if Producer requires a shorter period of time and requests such in writing, of Producer's written request therefor, provided that if Owner fails to submit a written biography and/or photographic likeness within such five (5) business day time period, reducible to two (2) business days if Producer requires a shorter period of time and requests such in writing, then Owner does not have the right to submit and/or approve any factual, accurate biography and/or photographic likeness used by Producer.

(c)     <u>Institution of Legal Action</u>: The free and unrestricted right, exercisable at Producer's cost and expense, to institute in the name of and on behalf of Owner, suits and proceedings at law or in equity to enjoin and restrain any infringement(s) of the rights herein granted; Owner hereby assigns to Producer any and all causes of action arising from any such infringement(s) and any and all recoveries obtained in any such action. Owner will not compromise, settle or in any manner interfere with any such litigation. Producer shall furnish Owner with copies of any documents and notices hereunder; provided, that any inadvertent failure to do so shall not be deemed to be a breach of this Agreement.

(d)     Nothing contained in this Agreement shall be construed as requiring Producer to exercise or exploit, or continue to exercise or exploit, any of the rights herein granted or to maximize revenues.

(e)     The Rights herein granted are in addition to, and this Agreement shall in no way limit, the rights with respect to the Property or the subject matter thereof which Producer or its

DocuSign Envelope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

assignees may now or hereafter enjoy as a member of the general public.

(f)    All rights granted and agreed to be granted to Producer under this Agreement shall be irrevocably vested in Producer in perpetuity, including, without limitation, for the full term of copyright protection everywhere in the world and in any and all renewals, extensions and revivals thereof.  As a material part of the consideration moving to Producer for its execution of this Agreement, Owner agrees that in the event the termination of transfer provisions of Section 203 of the United States Copyright Act shall be applicable prior to the termination of Producer's rights hereunder, and/or if Owner otherwise becomes entitled to exercise any right of reversion or recapture (the "Recapture Rights"), Producer shall have a right of first negotiation and right of last refusal with respect to the renewal of the rights granted to Producer hereunder.  If Owner fails to do any of the things specified in this paragraph, Producer is hereby irrevocably granted the power coupled with any interest to perform such acts and take such proceedings in the name and on behalf of Owner as its attorney-in-fact.

4.    <u>PASSIVE PAYMENTS</u>.  If the Picture is released and if Producer, or its assignee, licensee, or designee, elects, in its sole discretion, to produce a Subsequent Production, and if Owner does not render writing services on the respective Subsequent Production and Owner receives sole writing credit and sole separation of rights pursuant to WGA rules and regulations, then, upon commencement of principal photography of each such Subsequent Production, Owner shall receive the following:

(a)    Theatrical Sequel/Prequel.  An amount equal to one-half (1/2) of the Purchase Price and back-end participation actually paid to Owner pursuant to Section 3 above and the Profit Participation Rider, payable on or before the first day of principal photography on such sequel/prequel.

(b)    Theatrical Remake.  An amount equal to one-third (1/3) of the Purchase Price and back-end participation actually paid to Owner pursuant to Section 3 above and the Profit Participation Rider, payable on or before the first day of principal photography on such remake(s).

(c)    Television Series.  For each pilot or episode of a TV series:

i.  If intended for initial broadcast on U.S. primetime network free television (i.e., ABC, CBS, CW, NBC or Fox), the following royalties ("TV Network Amount") upon commencement of principal photography thereof:

1.  Up to 30 minutes: Two Thousand One Hundred Seventy-Two United States Dollars (US$2,172.00) for each episode.

2.  More than 30 minutes, up to 60 minutes: Four Thousand One Hundred Twenty-Seven United States Dollars (US$4,127.00) for each episode.

3.  More than 60 minutes: Five Thousand Four Hundred Thirty United States Dollars (US$5,430.00) for each episode.

ii.  If intended for initial broadcast on premium cable (i.e., Showtime, Starz or HBO) or

Premium SVOD (i.e., Netflix, Hulu or Amazon), a sum equal to Seventy-Five Percent (75%) of the TV Network Amount.

iii.  If intended for initial broadcast on basic cable, a sum equal to Fifty Percent (50%) of the TV Network Amount.

iv.  Reruns:  Twenty Percent (20%) of the applicable royalty shall be payable for each of the first five (5) television exhibitions in the United States or Canada after the first run.

(g)  Movies-of-the-Week and Television Mini-Series.  For each movie-of-the-week or television mini-series primarily intended for initial U.S. television or streaming exhibition, $10,000 for each hour, but not more than $100,000 in aggregate.

(h)  100/50/50: If an episode produced under subparagraph (c) is initially released theatrically in the U.S., an additional sum equal to One Hundred Percent (100%) of the royalty under the applicable subparagraph; if theatrically released outside the U.S., an additional Fifty Percent (50%) of the applicable royalty; and if theatrically released in the U.S. following its first television broadcast in U.S., an additional Fifty Percent (50%) of the applicable royalty. Notwithstanding the foregoing, for purposes of determining the additional sum due Owner for an episode produced under subparagraph (c), the royalty shall be calculated based on the length of the episode as theatrically released.

(i)  Spinoff Series Royalties:

i.  Owner shall receive Fifty Percent (50%) of the applicable royalties set forth in Sections 6(c)(i) to 6(c)(iii) in connection with any so-called generic television spinoff series.

ii.  Owner shall receive Twenty-Five Percent (25%) of the applicable royalties set forth in Sections 6(c)(i) to 6(c)(iii) in connection with any so-called planted television spinoff series.

(j)  In the event any of the amounts payable to Owner pursuant to this Section 6 are greater than the minimum amounts payable under the WGA MBA (as defined below) for the applicable subsequent productions (the "Minimum Scale Amounts"), then, such amounts as expressly set forth herein shall be paid in lieu of the Minimum Scale Amounts, and not in addition thereto.  In the event the amounts payable to Owner under this Section 6 are less than the applicable Minimum Scale Amounts, then only such amounts as actually received by Writer hereunder shall be credited against the Minimum Scale Amounts to be paid to Owner, as applicable.

(k)  In the event Owner receives shared credit on the Picture and/or shared separation of rights, then the applicable passive participation payments otherwise payable to Owner set forth herein shall be reduced by one-half (1/2).

5.  <u>REVERSION OF RIGHTS</u>.  In the event that Producer does not commence principal photography on

DocuSign Envelope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

the Picture within five (5) years following payment of the Purchase Price, (the "Reversion Date"), then all rights shall revert to Owner (the "Reversion"); provided that any reversion to Owner shall be subject to a repayment obligation in an amount equal to any and all actual, verifiable, out of pocket expenses and costs incurred by Producer in connection with the Property, including without limitation, all compensation paid by Producer to Owner hereunder, plus interest equal to the prime rate of Producer's bank from time to time in effect plus 2% (accruing as of the Reversion Date) (collectively, the "Turnaround Fee"). The Turnaround Fee shall be secured by a first priority lien (subordinate only to applicable guild's security interest) on the rights granted hereunder in favor of Producer. In accordance with the foregoing, in the event of a Reversion, Owner shall execute, acknowledge and deliver to Producer following a reasonable opportunity to review and comment thereon, not to exceed five (5) business days, reducible to two (2) business days if Producer requires a short period of time and requests such in writing, for Producer's written request therefor, upon the Reversion Date, and at such times thereafter as Producer may in its reasonable discretion require, all such notices, mortgages, mortgages and assignments of copyright, financing statements, continuation statements, security agreements, assignments, transfers and other documents and instruments as Producer shall reasonably require to further evidence, perfect, effect, protect and/or enforce its security interest. Without limiting the foregoing in any manner, Owner hereby authorizes Producer to file any and all financing statements under the Uniform Commercial Code of the State of California, and/or any other applicable states, and amendments thereto. The Turnaround Fee shall be payable to Producer (or Producer's assignee or designee) on commencement of principal photography of any audiovisual production based on the Property.

6.    REPRESENTATIONS AND WARRANTIES. Subject to Article 28 of the WGA MBA, Owner hereby represents and warrants that, to the best of Owner's reasonable knowledge and belief: (a) the Property was written solely by and is original with Owner; (b) neither the Property nor any element thereof infringes upon any other literary property; (c) subject to the exclusion of any material created or otherwise added by Producer or any other party, the production or exploitation of any motion picture or other production based on the Property will not violate the rights to privacy of any person or constitute a defamation against any person, nor will production or exploitation of any motion picture or other production based thereon in any other way violate the rights of any person; (d) Owner owns all rights in the Property as specified herein above free and clear of any liens, encumbrances, claims or litigation, whether pending or threatened; (e) Owner has full right and power to make and perform this agreement; (f) the Property has not previously been exploited as a motion picture, television production, play or otherwise than in book form, and no rights have been granted to any third party to do so; and (g) there are no claims, litigation or other proceedings pending or threatened which could impair, limit, diminish or infringe upon the Rights.  Owner has not and will not at any time enter into any agreement which conflicts in any way with this Agreement or undertake or permit activities which will interfere with, diminish or compete with the exercise of any of the Rights, or attempt to sell, license, assign, dispose of or encumber any of the Rights.

7.    INDEMNIFICATION.

(a)    Owner: Owner will at all times indemnify and hold Producer, its affiliates and their respective officers, directors, agents, shareholders and employees and Producer's licensees, distributors, successors and assigns, harmless from and against all third party claims, demands, suits, liabilities, judgments, settlements, losses, costs, damage and expenses, including without limitation reasonable outside attorneys' fees, whether or not in connection with litigation (collectively, "Claims"), arising out of or in connection with any uncured material breach by Owner of any representation, warranty or agreement

DocuSign Envelope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

made or entered into herein or hereunder by Owner.

(b)     <u>Producer</u>: Producer will at all times defend, indemnify and hold Owner and its successors and permitted assigns harmless from and against all Claims arising out of or in connection with (a) any uncured material breach by Producer of any representation, warranty or agreement made or entered into herein or hereunder by Producer; (b) any third party material added to the Property by Producer or its assignees or at their direction; or (c) the development, production, marketing or exploitation of the Picture and all elements thereof and ancillary rights thereto, except to the extent such Claims are based upon, derived from or related to any uncured material breach by Owner hereunder.

8.    <u>TRANSPORTATION AND EXPENSES</u>:  If Producer requires either or both Owner to perform services at a location more than fifty (50) miles away from Owner's (as applicable) principal residence, which is Los Angeles, California (the "Principal Residence"), then at all times subject to the Producer-approved budget for the Picture, on a most favored nations basis with all other non-cast above the line individuals:

(a)     <u>Air Transportation</u>:  Producer shall furnish either or both Owner (as applicable) with business-class round-trip transportation by air to and from such location. If Owner is required at such a location for fourteen (14) consecutive days or more, one (1) additional coach-class transportation (if available, and also if used) to and from such location for Owner's spouse or non-business-related companion on a one (1) time basis only.

(b)     <u>Accommodations/Per Diem</u>:  Producer shall furnish either or both Owner (as applicable) with a hotel or similar accommodations, not less favorable than that furnished to any non-cast individual.

(c)     <u>Ground Transportation</u>: Producer shall provide either or both Owner (as applicable) with exclusive ground transportation to and from airports, Owner's Principal Residence and Owner's overnight accommodations set forth in subparagraph (b) above.

(d)     <u>Rental Car</u>: Either or both Owner (as applicable) shall be furnished with an insured rental car, and reimburse Owner for gas expenses incurred by Owner related to work covered herein.

9.    <u>ADDITIONAL DOCUMENTS</u>. Owner agrees to execute at Producer's reasonable request any and all additional documents or instruments consistent herewith, including but not limited to the short form assignment for purposes of recording in the United States Copyright Office (Exhibit A), and to do any and all things reasonably necessary or desirable to effectuate the purposes of this agreement. If such short form assignment is undated, Producer is authorized to date such short form assignment and to file the same in the Copyright Office immediately upon execution thereof. If Owner fails to do anything necessary or desirable to effectuate the purposes of this Agreement, including, but not limited to, renewing copyrights and instituting and maintaining actions for infringement of any rights herein granted to Producer under copyright or otherwise, after a reasonable opportunity to review and comment (not to exceed five [5] days from Producer's request therefor), Owner hereby irrevocably appoints Producer as Owner's attorney-in-fact with the right, but not the obligation, to do any such things and renew copyrights and institute and maintain actions in Owner's name and behalf, but for Producer's benefit, which appointment shall be coupled with an interest and shall be irrevocable. Producer shall provide Owner with a copy of any document and/or instrument so executed in

DocuSign Envelope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

Owner's name, provided that Producer's inadvertent failure to do so shall not affect the validity thereof.

10.     SCREENPLAY CREDIT. Producer, or its assignee, shall accord Owner credit in connection with the Picture. No casual or inadvertent failure by Producer, nor the failure by any third party, to accord the credit provided for in this Section shall be deemed a breach of this Agreement provided, however, that upon Owner's written notice to Producer of a material failure to accord such credit, Producer shall use reasonable efforts to cure such failure on a prospective basis with respect to prints not yet issued or ads not yet prepared. Producer shall contractually bind the domestic distributor of the Picture and use good faith efforts advise all direct third party licensees of its credit obligations hereunder.

11.     ASSIGNMENT.  Producer shall have the right to assign this agreement or any part hereof only to a financially responsible party upon the terms and conditions set forth in this agreement, and any such assignment and transfer shall be made specifically subject to the terms and conditions and payments of this agreement, regardless of whether or not Producer becomes or remains involved in the production of the Property. Producer shall remain secondarily liable to this Agreement in the event of an assignment, unless such assignment is to a major or mini-major studio or a major television network, and that entity accepts all of Producer's obligations in writing. Owner may not assign this agreement (except for the limited right to assign Owner's rights to receive monetary payments provided to Owner by this Agreement).

12.     BLU-RAY:  Upon written request by Owner, Producer shall provide Owner each with one (1) DVD or Blu-Ray copy of the Picture, if and when such DVD or Blu-Rays of the Picture are commercially available, pursuant to and subject to the terms and conditions of any applicable distributor's DVD and/or Blu-Ray distribution policies and practices.

13.     PREMIERES/SCREENINGS: Provided that Owner is not in uncured material breach of this Agreement, then each Owner, and three (3) guests of such Owner, shall be invited to attend all major United States "celebrity" premieres of the Picture and major festival showings of the Picture.

14.     NOTICES: All notices pursuant to this Agreement shall be given in writing and delivered as follows: (a) in person; (b) by certified U.S. Mail, return receipt requested; or (c) by recognized courier or messenger service that provides proof of delivery (e.g., FedEx, UPS).  Date of service of such notice shall be the date of delivery. Notice by e-mail shall only be effective if acknowledged in writing by the recipient (or by recipient's authorized representative).  Payments and written notices may be delivered to the parties as follows:

OWNER:
Chadwick Darnell
250 10th Street NE #2419
Atlanta, GA 30309

PRODUCER:
c/o Ramo Law PC
315 S Beverly Dr., Ste. 210
Beverly Hills, CA 90212
Attn: Michelle Chang

DocuSign Envelope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

15.   <u>REMEDIES</u>. Provided Producer has paid the Purchase Price, Producer shall be entitled to seek injunctive and other equitable relief to prevent any breach of this Agreement by Owner and to secure the enforcement of this Agreement. The rights and remedies of Owner in the event of a breach of this Agreement by Producer are limited to money damages, if any, and under no circumstances shall Owner be entitled to terminate or rescind this Agreement or enjoin, restrain or in any way interfere with the distribution, exhibition, or exploitation of the Picture, and the rights therein, or the use, publication, dissemination or any advertising issued in connection therewith and Owner irrevocably waives any right to equitable or injunctive relief. Producer's rights and remedies shall be cumulative, and the exercise by Producer of one or more of such rights or remedies shall not preclude Producer's exercise of any other right or remedy, at law, or in equity.

16.   <u>PUBLICITY</u>. Unless first approved in writing by Producer, Owner shall not issue or authorize the publication of any news stories or articles, books or other publicity (including but not limited to blogs and social media networking services) relating directly or indirectly, to the subject matter of this Agreement, the Picture, or the services to be rendered by others in connection with the Picture, or make any derogatory, knowingly false statements relating to the subject matter of this Agreement, the Picture, or the services to rendered by others in connection with the Picture, except personal publicity in which the Picture and/or such production, as applicable, is only incidentally, non-derogatorily mentioned following the initial Producer authorized press release for the Pictures.  Producer shall have the sole authority to regulate activities on set. Owner shall not have the right to bring any individual on set or to photograph or film any sets, individuals or activities without the prior written approval of Producer.  Without in any way limiting the foregoing, Owner's original version of the Property may be shared with third parties as part of Owner's professional portfolio, provided that Owner gives three (3) business days' advance written notice, naming the party(ies) with whom Owner wishes to share Owner's original version of the Property, for Producer to approve or deny Owner's request, provided that Producer will not unreasonably deny any such request by Owner; Producer's failure to object or respond to Owner's notice shall be deemed acceptance by Producer.

17.   <u>ADDITIONAL INSURED</u>. Producer shall add Owner as an additional insured under the errors and omissions and general liability insurance policies with respect to the Picture, if any, subject to the terms and conditions and restrictions of said policies, including any deductible or policy limits; provided, however, that (a) the inclusion of Owner on such policies will not relieve Owner in any way whatsoever from Owner's representations, warranties and indemnities contained herein; and (b) the foregoing shall not be construed to provide for any waiver of the insurance company's right of subrogation.

18.   <u>DISPUTE RESOLUTION</u>:  All noncredit-related disputes shall be submitted to confidential final and binding arbitration.  The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, including the rule providing that each party shall pay pro rata its share of JAMS fees and expenses (save and except: (i) that the arbitrator in such arbitration proceeding may require that any arbitration fees be borne in such other manner as the arbitrator determines is required in order for this arbitration clause to be enforceable under applicable law, and (ii) in the event of an appeal, in which instance the appealing party shall pay all costs and expenses of the appeal, including the fees of the appellate arbitrators and the reasonable outside attorneys' fees of the opposing party, unless the decision of the arbitrator is reversed, in which event the expenses of the appeal shall be borne as determined by the appellate arbitrators), and the Optional Appeal Procedure, at the Los Angeles office of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules"), but shall not pre-empt any WGA mandated arbitration, if applicable, which shall take precedence over any other proceeding.  The arbitration

DocuSign Envelope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

shall be conducted in Los Angeles County before a single neutral arbitrator who shall be an attorney or retired judge with at least ten (10) years' experience in the motion picture industry (e.g., the arbitrators designated in the DGA, SAG or WGA collective bargaining agreements or persons having comparable qualifications), who shall be appointed in accordance with the Arbitration Rules (or WGA rules, as applicable). The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the dispute.  The parties waive the right to seek punitive damages and the arbitrator shall have no authority to award such damages.  The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct or vacate the award.  Unless the parties agree otherwise, the neutral arbitrator and the members of any appeal panel shall be former or retired judges or justices of any California state or federal court with experience in matters involving the entertainment industry. Judgment upon the award may be entered in any court of competent jurisdiction.  The party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including reasonable, outside attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered. For purposes of clarity, any credit-related disputes shall be resolved per the provisions of Section 14 above.

19.    <u>MISCELLANEOUS</u>. This Agreement shall be subject to and construed in accordance with the laws of the State of California applicable to agreements which are executed and fully performed therein. Except as expressly provided to the contrary herein, each provision of this Agreement shall be considered separate, and in the event that any provision is held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions shall continue in full force and effect. Any Dispute or part thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated pursuant to applicable law may be heard only in a court of competent jurisdiction in Los Angeles County.  The parties hereby submit to the exclusive jurisdiction and venue of the local, state and federal courts located in Los Angeles County. Nothing contained herein shall constitute a partnership between or joint venture by the parties or constitute either party as the agent of the other. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument, respectively. Executed copies of the signature pages of this Agreement sent by facsimile or transmitted electronically in either tagged image format files (TIFF) or portable document format (PDF) shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment. This Agreement constitutes the entire agreement between the parties and cannot be modified, supplemented or amended except by written instrument executed by the parties and supersedes and cancels all other and former agreements and understandings in the premises between the parties as of the date hereof. The waiver by either party of any breach of this Agreement shall not constitute a waiver of any subsequent breach. Any waiver must be in writing to be effective. Headings are for the ease of reference only, and shall not be given any weight in interpreting this Agreement. No officer, employee or representative of Producer has any authority to make any representation or promise in connection with the Agreement or the subject matter hereof which is not contained herein, and Owner agrees that Owner has not executed the Agreement in reliance upon any such representation or promise.

*(signature page to follow)*

DocuS gn Enve ope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

IN WITNESS WHEREOF, the parties hereto have signed this Agreement as of the Effective Date above.


AGREED TO AND ACCEPTED:


OWNER

DocuSigned by:

*Chadwick Darnell*
Chadwick Darnell


PRODUCER

DocuSigned by:

*David Brown*
Undertaker LLC

DocuSigned by:

*Todd Lundholm*
Undertaker LLC

DocuSign Envelope ID: 6C9D6001-8A98-42CE-9532-614DB51F34AD

**EXHIBIT A**

SHORT FORM ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS: That in consideration for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the undersigned Chadwick Darnell ("Owner") hereby sells, grants, assigns and sets over unto Undertaker LLC (hereinafter referred to as "Producer"), and Producer's representatives, successors and assigns forever, all right, title and interest (including but not limited to all motion picture rights, television motion picture and other television and all allied and ancillary rights, including by way of illustration merchandising, soundtrack and music publishing rights) throughout the Universe, in perpetuity, in and to that certain work of authorship currently entitled "The Undertaker's Wife" written by Owner (which, together with the title, themes, contents and characters and other versions thereof, are hereinafter collectively called the "Property"), and in and to the copyright of the Property and all renewals and extensions of such copyright, and in and to the motion picture project based thereon (the "Picture") . This Assignment is subject to the terms and conditions of that certain Agreement between the Owner and Producer dated as of December 30, 2019.

Producer is also hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning all copyrights in and to the Property and/or the Picture, and all renewals thereof, or concerning any infringement thereof, or interference with any of the rights hereby granted under said copyrights or renewals thereof, in its own name or in the name of Owner or other copyright proprietor, but at the expense of Producer, and, at its option, Producer may join such copyright proprietor and/or Owner as a party plaintiff or defendant in any such suit, action or proceeding.

IN WITNESS WHEREOF, the undersigned has executed this Short Form Assignment as of December 30, 2019.


AGREED AND ACCEPTED:

OWNER

*Chadwick Darnell*
Chadwick Darnell



PRODUCER

*David Brown*
Undertaker LLC

*Todd Lundholm*
Undertaker LLC

# EXHIBIT 2

DocuSign Envelope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

# DIRECTOR AGREEMENT

This DIRECTOR AGREEMENT ("Agreement") is entered into as of January 8, 2020 by and between Undertaker LLC ("Company") and Mandra Pictures LLC ("Lender"), a Georgia limited liability company, for the services of Chadwick Darnell ("Director") in connection with the motion picture presently entitled "The Undertaker's Wife" ("Picture").

1.     CONDITIONS PRECEDENT.  Company shall have no obligations hereunder unless and until (a) Company has received the following, in form and substance satisfactory to Company: (i) a copy of this Agreement executed by Lender and Director; (ii) a copy of the certain Screenplay Purchase Agreement dated as of December 30, 2019 (the "Purchase Agreement") executed by Director (hereby acknowledged as received by Company); (iii) all forms and documents legally necessary to enable Company to effect payment to Lender, including without limitation, a properly completed IRS Form W-9 and any other tax and identification forms required by Company and Lender's submission to Company of original documents satisfactory to Company to demonstrate Director's employment eligibility to perform services in all locations in which Company will require Director's services; and (b) Company's receipt and approval of all of the chain of title documentation in connection with the Picture (collectively "Conditions Precedent").

2.     LOANOUT:  The services of Director are being furnished to Company by Lender. Consequently, all services and obligations to be performed hereunder by Director shall be deemed to be performed by Director at the direction of Lender, and all compensation and other payments for the performance of such services and obligations shall be paid by Company to Lender.  All warranties and representations made by either Lender or Director shall be deemed made in addition by the other, and a breach of this Agreement by either Lender or Director shall be deemed a breach by both.

3.     SERVICES.

3.1     Subject to the terms and conditions hereof, Company engages Lender to cause Director to personally render all customary director services during pre-production, production, and post-production of the Picture as reasonably required by Company, in any and all locations reasonably required by Company. Such services shall be rendered on an exclusive basis commencing upon pre-production of the Picture until delivery to Company of the Director's Cut (as defined below); thereafter, Director shall be available to render services on a non-exclusive, first-priority basis until delivery of the completed Picture to the distributor(s), in accordance with Company's approved post-production schedule.  Director shall complete the Director's Cut (defined below) of the Picture no later than by such date designated by Company pursuant to Company's approved post-production schedule; however, Company may provide written notice to Director to extend, subject to extensions for force majeure and for compliance with Company's instructions. Time is of the essence with regard to Director's services pursuant to this Paragraph 3.1 and in the event that Director fails to abide by the material terms of this provision, subject to Director's opportunity to cure pursuant to Paragraph 15 below, such shall be deemed a material breach.

3.2     If, after the end of Director's services hereunder, Company should require further services of Director in the making of retakes, added scenes, looping, cutting and editing, post synching, publicity interviews, stills and similar matters, Lender agrees to cause Director to render such services, provided if Director is not reasonably available to render such services when and where required by Company, then Company shall have the right to engage a third party(ies) in connection therewith.

3.3     Director shall render services as reasonably instructed by Company in all matters, including those involving artistic taste and judgment, whenever and wherever Company may reasonably require.

4.     <u>ABANDONMENT</u>.  Company may at any time elect to abandon development, production, distribution and/or other exploitation of the Picture and/or to terminate Lender's engagement and Director's services in connection with the Picture for any reason, which election shall be made in Company's sole discretion.  Thereafter, neither Company, Lender nor Director shall have any further obligations to each other pursuant to this Agreement, other than to pay Lender any Fixed Compensation and Back-end Compensation (each as defined below) actually vested prior to such abandonment.

5.     <u>PRODUCTION OF THE PICTURE</u>.  Director shall direct the Picture pursuant to Company's reasonable instructions and directions respecting all matters, including artistic taste and judgment, and in accordance with Company's reasonable specifications and requirements, the screenplay (the "Screenplay"), the budget and the production schedule for the Picture.  Without limitation: (i) The Picture as delivered by Director shall have a running time of not less than ninety (90) minutes and no more than one hundred twenty (120) minutes and an MPAA rating not more restrictive than "R."  Director shall prepare sufficient alternative scenes and dialogue in order to meet any rating restrictions in accordance with instructions provided by Company to Director; (ii) The Director's Cut shall not materially deviate from the Screenplay, except for minor "on the floor" changes and/or changes which are requested and/or approved by Company (or its representatives) in writing; (iii) Except as otherwise set forth in Paragraphs 3 and 8, Company shall have full and final creative, financial, and day-to-day control over the Picture, with the complete and unconditional right to cut and edit the Picture; (iv) Company shall have the right to view dailies and all cuts of the Picture at any time; (v) Except for the Director's Cut, Director shall not authorize or permit any cuts of the Picture without the prior written authorization of Company; and (vi) Except as otherwise set forth in Paragraph 8 below, as between Company and Director, Company shall have all approvals and controls and the right to initiate action at any time and in any connection with respect to the Picture.

6.     <u>COMPENSATION</u>.

6.1     <u>Fixed Compensation</u>.  Unless the currency of another nation is expressly set forth herein, all references in this Agreement to "Dollars" or "$" shall mean United States currency. Provided that Lender and Director are not in breach of this Agreement, Lender shall be entitled to fixed compensation (the "Fixed Compensation") equal to a fixed Twenty-Five Thousand United States Dollars (US$25,000.00), payable as follows: (a) Five Thousand United States Dollars (US$5,000.00) is hereby acknowledged as paid to Director, and (b) Twenty

DocuSign Envelope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

Thousand United States Dollars (US$20,000.00) shall be payable in equal weekly installments over the period of principal photography of the Picture.

6.2   Contingent Compensation: In addition to the Fixed Compensation, provided Lender and Director are not in uncured material breach of this Agreement, Lender shall be entitled to receive Two and One-Half Percent (2.5%) of One Hundred Percent (100%) of the "Producer's Share of Net Profits" (the "Back-end Compensation"). The "Producer's Share of Net Profits" shall be defined in accordance with Company's definition of "Producer's Share of Net Profits", but in any event on a most favored nations basis with all participants of the Producer's Share of Net Profits.

7.   CREDIT.  Provided that Lender and Director are not in breach hereof and that no less than ninety percent (90%) of the principal photography of the Picture is completed under Director's direction, Director shall be accorded the following credit:

7.1   A form of "Directed By" credit, as follows:

7.1.1   On screen, on all positive prints of the Picture, on a single card, in the main titles (i.e., wherever all other individual credits appear), in a size of type not less than the size of type used to display any other individual credits therein.

7.1.2   In the billing block of paid advertisements issued by or under the control of Company, or its assignees and licensees, in which the billing block appears, in a size of type not less than the size of type used to display any other individual credits therein, subject to standard and customary exclusions and exceptions; provided, however, in the event any producer and/or writer receives credit in any so-called "excluded ads" (other than in prize, nomination, award or congratulatory-type ads wherein only the names of the persons receiving such recognition appear), then Director's credit as set forth above shall appear therein.

7.2   General:  For paid advertisements, the obligation shall apply only to the billing portion (excluding artwork and advertising copy) of advertisements issued by Company, its assignee or licensee, or under its direct control relating primarily to the Picture.  No casual or inadvertent failure to comply with billing requirements, nor the failure of any third party to so comply, shall be a breach of this Agreement.

8.   APPROVALS/EDITING RIGHTS.

8.1   Rights Personal to Director.  The rights granted under this Paragraph 8 are personal to Director, and none of them may be granted by Director to any other person or entity. Director's rights hereunder are subject to Lender and Director not being in breach hereunder, including maintaining timely delivery of the Picture in accordance with the Company-approved post-production schedule.

8.2   Cutting Rights.  Director shall be entitled to one (1) cut of the Picture (the "Director's Cut"). As between Director and Company, Company shall have final cut of the Picture.

DocuSign Envelope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

9.    GRANT OF RIGHTS.  The results and proceeds of Lender and Director's services hereunder and any and all material, works, writings, ideas, "gags", dialogue or other matter written, composed, prepared, submitted, suggested or interpolated by Lender and/or Director in connection with the Picture, or its preparation or production (collectively, the "Material"), shall automatically become the exclusive property of Company as a "work-made-for-hire" and accordingly Company shall be deemed the sole author and owner thereof with the exclusive right to register the copyright, including any extensions or renewals, of the Material throughout the world.  Notwithstanding anything herein to the contrary, in the event Lender and/or Director's services hereunder, for any reason, are deemed not to be a "work-made-for-hire" specifically commissioned for use as part of a motion picture under the United States copyright law, Lender and Director hereby irrevocably grant, set over and assign to Company throughout the universe, exclusively and in perpetuity, free and clear of any and all claims, liens and encumbrances, all right, title and interest of every kind whatsoever, whether now known or unknown, in and to the Material and all other results and proceeds of Lender and Director's services hereunder and the rights to own, sell, distribute, market and exploit such results and proceeds in any and all media and by any means, now known or hereafter developed. Lender and Director's grant of rights in this Agreement is irrevocable and without right of termination or rescission by Lender or Director and shall not be affected by the termination or expiration of this Agreement.  Lender and Director grant to Company the perpetual, non-exclusive right to use, display and reproduce, and license others to use, display and reproduce, the name, voice, likeness and biography of Director in connection with any services Director may perform hereunder, or in connection with the Picture or advertising or exploitation thereof and/or any distributor or licensee of the Picture, or any of its/their partners, and regardless of whether any of the foregoing are advertiser supported, subscription, or otherwise (including, without limitation, in and in connection with institutional advertising of Company, or any distributor or licensee of the Picture, or other exhibitors of the Picture, or any of its/their partners), provided Director shall not be depicted as endorsing any product or service without Director's prior written consent. Director shall submit to Company a written biography within five (5) business days (which five [5] business day period may be reduced to two [2] business days if Company requires Director's response in such shorter time period in writing due to a production exigency) of Company's written request therefor.  Provided that Director timely submits such biography, Company shall primarily draw from the biographical information contained in such written biography so furnished.  If Director fails to submit a written biography within five (5) business days (which five [5] business day period may be reduced to two [2] business days if Company requires Director's response in such shorter time period in writing due to a production exigency) of Company's written request therefor, then Director waives Director's biographical submission right. Company shall have the unrestricted right, but not the obligation, to make any changes in, deletions from or additions to the Material and/or the Picture, or any part thereof, and to use the same or any version thereof for any and all purposes throughout the universe in perpetuity in any and all media now existing or hereafter devised, and Lender and Director hereby waive any right of droit moral or any similar right with respect to the Material and the Picture.  The parties acknowledge and agree that the compensation payable to Lender as set forth in Paragraph 6.1 includes adequate and equitable remuneration for Lender and Director's assignment of the so-called "rental and lending rights" and constitutes a complete buy-out of all such rental and lending rights hereunder.  Lender and Director hereby grant to Company throughout the universe in perpetuity, the right to collect and retain for Company's own account any and all amounts payable to Lender or Director in respect of such rental and lending rights and hereby direct any collecting societies or other persons or entities

DocuS gn Enve ope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

receiving such amounts to pay such amounts to Company.

10.     TRANSPORTATION AND EXPENSES. If Director is required by Company to render services hereunder more than fifty (50) miles away from Atlanta, Georgia (the "Principal Residence") in connection with production for the Picture, then Company shall provide Director with the following:

10.1     Air Travel. Company shall provide Director with One Thousand United States Dollars ($1,000.00) towards his airfare.

10.2     Accommodations. Company shall provide Director with reasonable accommodations at the distant location.

10.3     Rental Car. Company shall provide Director with a rental car while at the distant location, subject to Director's timely provision of a valid driver's license and any other identification forms related thereto.

Company is not responsible for any other expenses or prerequisites of Director.  All travel arrangements, including, but not limited to, the acquisition of airline tickets, booking of accommodations, etc., must be made through Company's location or travel department, unless prior written approval is obtained from an executive of Company.

11.     REPRESENTATIONS AND WARRANTIES. Lender and Director represent, warrant and agree that: (a) other than material provided to Director, all literary, dramatic and musical material, designs and inventions of Director hereunder will be original with Director or in the public domain throughout the world or furnished by Company, and will not infringe upon or violate any copyright of, or, to the best of Director's knowledge using reasonable prudence in such matters, the right of privacy or any other right of, any person or company; and (b) there is no claim, action, or encumbrance, nor any agreements or arrangements whatsoever with any person or entity, or any obligation (past, present or future), pending or, to the best of Director's knowledge using reasonable prudence in such matters, threatened, relating to or affecting the services and material to be provided by Director hereunder, which in any way shall impair or adversely affect the rights granted to Company pursuant hereto. Lender and Director further represent and warrant that (i) Lender is a corporation duly organized and existing under the laws of Lender's state or country of incorporation; (ii) to the extent required by law, Lender has workers' compensation insurance covering Director and will maintain the same at all times while Director is rendering services hereunder; (iii) Lender is a bona fide corporate business entity established for a valid business purpose within the meaning of the tax laws of the United States and not a mere sham, conduit or agent for Director; (iv) Director is under a contract of employment with Lender for a term extending at least until the completion of all services required of Director hereunder, which contract, inter alia, gives Lender the right to loan or furnish Company Director's required services; and (v) if Lender was incorporated outside the United States of America, it is not engaged in any trade or business in the United States and does not have a "permanent establishment" in the United States (as that term is defined in the Tax Treaty between the United States and the country of incorporation), and it does not have any agent in the United States who has, or habitually exercises, general authority to negotiate and conclude contracts on its behalf.

DocuSign Envelope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

12.    <u>INDEMNIFICATION</u>.   Lender and Director hereby agree to indemnify and hold harmless Company, its parents, subsidiaries and affiliates, and the officers, producers, shareholders, employees, agents, licensees and assigns of Company, from and against any and all liabilities, losses, claims, damages, demands, costs (including without limitation reasonable outside attorneys' fees) and expenses (collectively, "Damages") arising from or out of any third party claim in connection with a breach by Lender and/or Director of any agreement, representation or warranty made by Lender and/or Director under this Agreement. Except to the extent that Lender and/or Director is in breach or has intentionally, tortiously contributed to the event in question, and provided that Lender and Director reasonably cooperate with Company and follow Company's reasonable instructions in connection with "Claims" (as defined below), Company shall defend, indemnify and hold harmless Lender and Director against any Damages which Lender and/or Director may incur in connection with any third party claim or action or liability arising out of a breach of any of agreement, representation or warranty made by Company under this Agreement and/or the development, production, distribution, release and/or ancillary and subsidiary exploitation of the Picture or any element thereof (collectively, the "Claims") and shall provide Lender and Director with a defense.

13.    <u>NOTICES</u>.   All notices required hereunder shall be in writing and shall be given either by personal delivery, telecopy/facsimile or by United States mail (postage prepaid), and shall be deemed given hereunder on the date personally delivered or telecopied, or the date two (2) business days after the date mailed if mailed in the United States, and five (5) business days after the date mailed if mailed outside of the United States.   Until further notice, the addresses of the parties shall be as follows:

| | |
|---|---|
| For Lender/Director: | Mandra Pictures LLC f/s/o Chadwick Darnell<br>250 10th Street NE, #2419<br>Atlanta, GA 30309 |
| For Company: | Undertaker LLC<br>3940 Laurel Canyon Blvd., #1413<br>Studio City, CA 91604<br>Attn: David Brown |
| | With a copy to:<br>Ramo Law PC<br>315 S. Beverly Drive, Ste. 210<br>Beverly Hills, CA 90212<br>Attn: Michelle Chang, Esq.<br>Fax: 310-861-5246<br>Email: michelle@ramolaw.com |

14.    <u>ASSIGNMENT</u>.   Company shall be free to assign this Agreement and its rights hereunder, and to delegate its duties at any time and from time to time, in whole or in part, to any person or entity, and upon such assignment, Company shall be released and discharged of and from any and all duties, obligations, and liabilities arising under this Agreement, except that in the

DocuSign Envelope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

event such assignment is not made to a U.S. major studio, U.S. mini-major studio, U.S. television network, or other similarly financially responsible film production or distribution company, that assumes Company's material obligations herein in writing, Company shall remain secondarily liable for its obligations hereunder. Lender and Director may not assign this Agreement or Lender and/or Director's rights hereunder (except for the right to receive compensation under this Agreement, which may be freely assigned upon written notice thereof to Company), or delegate Lender and/or Director's duties under this Agreement in whole or in part.

15.  SUSPENSION/ TERMINATION.  Company shall have the right to suspend Director's services and the compensation under this Agreement during all periods (i) that Director does not render services hereunder because of illness, incapacity, incompetence by alcohol and/or substance abuse, and/or breach; and (ii) that development and/or production of the Picture is materially prevented or interrupted because of an event of force majeure or any other event which so materially prevents or interferes with the development and/or production of the Picture including, without limitation, any labor dispute, strike, fire, act of terrorism, war or governmental action, or any disruptive event beyond Company's reasonable control and/or by reason of the death, illness or incapacity of a principal member of the cast or crew. Unless this Agreement is terminated, the period of Director's services provided for above shall be deemed extended by a period equivalent to all such periods of suspension.  If any matter referred to in subparagraph (i), other than breach, continues for longer than seventy-two (72) hours (reducible to forty-eight (48) hours due to exigencies) if during principal photography or ten (10) business days at all other times, or if any matter referred to in (ii) above continues for a period of six (6) consecutive weeks or eight (8) weeks in the aggregate, or in the event of any uncured material breach on the part of Director, Company may terminate this Agreement and shall have no further obligations hereunder, except with respect to any vested payment obligations, which shall survive subject to the remaining terms hereof.  For all purposes under the Agreement, a "breach" shall be defined as a material failure by Lender and/or Director (other than by reason of Director's disability or an event of force majeure) to perform any of Lender and/or Director's required material obligations under the Agreement, or a written statement by Lender and/or Director (directly or through any representative) that Lender and/or Director intends to fail to do so, whether then existing or prospective, which remains uncured following five (5) business days [reducible to twenty-four (24) hours during principal photography] from Lender's receipt of Company's written notice thereof.  No breach by Lender and/or Director under this Agreement (or any other agreement between Company, Lender and/or Director, whether or not related to the Picture), or termination of this Agreement pursuant to this Paragraph, or any failure to consummate any agreements between Company, Lender and/or Director (whether or not related to the Picture) shall affect Company's rights in and to the services of Lender and Director hereunder and/or the results and proceeds thereof. Notwithstanding anything to the contrary herein, during any period of suspension predicated on (ii) above, Director may render such other services in the field of entertainment, provided that any and all commitments for such services are subordinate to the obligations of Director's services hereunder, including Director's obligation to resume rendering services to Company within seventy-two (72) hours (reducible to forty-eight (48) hours due to exigencies) following Director's receipt of notice (which may be oral notice) of the termination of the suspension.  For further clarity, a termination "without cause" shall be for any reason not specifically set forth in subparagraphs (i)-(ii) herein.

DocuSign Envelope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

16. <u>NON-UNION</u>.   This Agreement shall not be subject to any union, labor organization, or collective bargaining agreement and Director is not a member of the Directors Guild of America ("DGA") or any equivalent guild or union and Company is not a signatory of the DGA; therefore, this Agreement shall not be subject to the DGA.

17. <u>NO DOUBLE BENEFITS/CROSS DEFAULT</u>.   In no event shall Lender and/or Director be provided with expenses or other benefits pursuant to either this Agreement and/or the Purchase Agreement so as to result in double benefits (other than compensation and credit, which shall not be considered double benefits); provided, however, that in the event that one agreement accords a benefit more favorable than the corresponding benefit accorded in any other agreement, Company shall provide Lender and Director with the more favorable benefit.   Any default by Lender and/or Director of any of the terms of the Purchase Agreement shall also be a default by Director under this Agreement.

18. <u>CONFIDENTIALITY</u>.   Lender and Director may not issue, release, authorize or in any way participate in any publicity, press releases, advertisements or promotional activities relating to Company or the Picture without the prior written consent of Company.   No publicity issued by Lender or Director shall contain derogatory mention of Company or the Picture, or the services of any person in connection with the Picture.   Lender and Director shall not disclose to any third party any confidential information with respect to Company or the Picture, except if required by law or to representatives and/or for quote purposes. Lender and Director further agree that Lender and Director will not divulge or make known to any person or entity any matters of a confidential nature pertaining to Company's business, except if required by law, by court order or to representatives. For the avoidance of doubt, Lender and Director's confidentiality and publicity restrictions hereunder shall apply to any and all media whatsoever, including, without limitation, any social networking site, micro-blogging service, online forum, personal website or blog, or user-generated or user-uploaded content website (e.g., Facebook, Twitter, Google+, Instagram, etc.).

19. <u>REMEDIES</u>.   The rights and remedies of Lender and Director in the event of breach of this Agreement shall be limited to the right, if any, to recover actual monetary damages in an action at law, and in no event shall Lender or Director be entitled to rescind this Agreement by reason of any such breach or to terminate this Agreement.   In addition, Lender and Director hereby waive the right in such event to seek equitable or injunctive relief or to seek to enjoin, restrain, or otherwise interfere with the production, distribution, exhibition, or other exploitation of the Picture or any other motion picture, television production or other product of the Material produced hereunder. It is mutually agreed that Director's services are special, unique, unusual, extraordinary and of an intellectual character giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law and that Company, in the event of any breach by Lender and/or Director, shall be entitled to seek equitable relief by way of injunction or otherwise.

20. <u>MISCELLANEOUS PROVISIONS</u>.

20.1    A waiver of any breach or provision hereunder shall not be deemed a waiver of any preceding or subsequent breach of the same or any other provision.

DocuSign Envelope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

20.2     Nothing contained in this Agreement shall require the commission of any act, or payment of any monies, which is contrary to an express provision of law or contrary to public policy, or to any provision of applicable guild or collective bargaining agreements.  If there shall exist any conflict between any provisions contained herein and any such law, policy or agreement, the latter shall prevail; and the provision or provisions herein affected shall be curtailed, limited or eliminated to the extent (but only to the extent) necessary to remove such conflict; and as so modified this Agreement shall continue in full force and effect.

20.3     Director acknowledges that flagrant violation of safety rules, sexual harassment and/or discrimination due to gender, race, orientation, or creed will not be permitted and constitutes grounds for immediate termination of this Agreement.

20.4     Director acknowledges that Company has a strict policy prohibiting the use of illegal (or un-prescribed) drugs or alcohol during working hours and failure to comply with this policy shall be cause for immediate dismissal.

20.5     This Agreement shall be governed and construed in accordance with the laws of the State of California applicable to contracts entered into and fully performed therein. Any and all controversies, claims or disputes arising out of or related to this Agreement or the interpretation, performance or breach thereof, including, but not limited to, alleged violations of state or federal statutory or common law rights or duties, and the determination of the scope or applicability of this agreement to arbitrate ("Dispute"), except as otherwise set forth below, shall be resolved according to the following procedures which shall constitute the sole dispute resolution mechanism hereunder.  In the event that the parties are unable to resolve any Dispute informally, then such Dispute shall be submitted to final and binding arbitration.  The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except as modified herein, including the Optional Appeal Procedure, at the Los Angeles office of JAMS, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules").  The arbitration shall be conducted in Los Angeles County before a single neutral arbitrator appointed in accordance with the Arbitration Rules.  The arbitrator shall follow California law and the Federal Rules of Evidence in adjudicating the Dispute.  The parties waive the right to seek punitive damages and the arbitrator shall have no authority to award such damages.  The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct or vacate the award.  Unless the parties agree otherwise, the neutral arbitrator and the members of any appeal panel shall be former or retired judges or justices of any California state or federal court with experience in matters involving the entertainment industry.  If either party refuses to perform any or all of its obligations under the final arbitration award (following appeal, if applicable) within thirty (30) days of such award being rendered, then the other party may enforce the final award in any court of competent jurisdiction in Los Angeles County.  The party seeking enforcement of any arbitration award shall be entitled to an award of all costs, fees and expenses, including reasonable outside attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered. Any Dispute or portion thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated

DocuSign Envelope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

pursuant to applicable state or federal law may be heard only in a California court (state or federal) of competent jurisdiction in Los Angeles County.  Any process in such proceeding may be served by, among other methods, delivering it or mailing it, by registered or certified mail, directed to, as applicable, Director's or Company's address as designated in this Agreement.  Any such delivery or mail service shall have the same effect as personal service within the State of California.

20.6     Lender and Director shall sign, acknowledge, and deliver to Company or cause to be signed, acknowledged, and delivered to Company any and all documents and/or instruments and do such other acts and deeds, in each case that are consistent herewith, as may be reasonably required by Company or its assignees or licensees to further evidence or effectuate its rights hereunder.  In the event of Lender and/or Director's failure to execute any such instruments after a reasonable opportunity to review and comment (not to exceed five (5) days of Company's request therefor), Lender and Director hereby irrevocably nominate, constitute and appoint Company as Lender and Director's true and lawful attorney-in-fact, which constitutes a power coupled with an interest. Company will provide Lender with a copy of any documents so executed but the inadvertent failure to do so shall not be deemed a breach by Company.

20.7     This Agreement (and any and all attachments and exhibits) contains the entire agreement between the parties hereto with respect to, and cancels and supersedes all prior negotiations and understandings relating to, Director's directing services for the Picture and contains all of the terms, covenants, conditions, representations and warranties of the parties hereto with respect to Director's directing services in connection with the Picture. If this Agreement has been revised during the course of negotiation, such revisions and prior drafts incorporating such revisions or original language shall be deemed made without prejudice to either party hereto. This Agreement shall be deemed to have been drafted by all the parties hereto, and no ambiguity shall be resolved against any party by virtue of its participation in the drafting of this Agreement. This Agreement may not be modified or amended unless by a written instrument executed by each of the parties hereto.  This Agreement may be executed in one or more counterparts and may be executed and delivered by facsimile or other electronic transmission and/or by PDF signature, each of which shall be deemed an original.

"Company"

Undertaker LLC

By: _David Brown_____
    9D295C2D3F26423...
Its: Authorized Signatory

"Lender"

Mandra Pictures LLC

By: _Chad Darnell_____
    2DCD1F6E6302409...
Its: Authorized Signatory
Federal ID: 46-2322953

-10-

DocuSign Envelope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

## INDUCEMENT BY DIRECTOR

Reference is hereby made to that certain agreement (the "Agreement") dated as of January 3, 2020 by and between Undertaker LLC ("Company") and Mandra Pictures LLC ("Lender"), for my directing services in connection with the Picture referenced in the Agreement.

A.  I am familiar with all of the terms, covenants and conditions of the Agreement and I hereby consent to the execution thereof.  I shall perform and comply with all of the terms, covenants, conditions and obligations of the Agreement as the same relate to me, even if the employment agreement between myself and Lender should hereafter expire, terminate or be suspended.  I hereby confirm all grants, representations, warranties and agreements made by the Lender under the Agreement.

B.  Unless I am deemed substituted for Lender as a direct party to the Agreement pursuant to Paragraph D below, I shall look solely to Lender and not to Company for the payment of compensation for my services and for the discharge of all other obligations of my employer with respect to my services under the Agreement.

C.  In the event of a breach or threatened breach of the Agreement by Lender or by me, Company may join me in any action against Lender without being first required to resort to or exhaust any rights or remedies against Lender.

D.  I represent that Lender is a duly qualified and existing corporation under the laws of its state of incorporation.  If Lender or its successors in interest should be dissolved or should otherwise cease to exist, or for any reason should fail, refuse or neglect to perform, observe or comply with the terms, covenants and conditions of the Agreement, I shall, at Company's election, be deemed to be employed directly by Company for the balance of the term of the Agreement upon the terms, covenants and conditions set forth therein.

E.  I will indemnify Company for and hold it harmless from and against any and all taxes which Company may have to pay and any and all liabilities (including judgments, penalties, fines, interest, damages, costs and expenses, including reasonable outside attorneys' fees) which may be obtained against, imposed upon or suffered by Company or which Company may incur by reason of its failure to deduct and withhold from the compensation payable under the Agreement, any amounts required to be deducted and withheld from the compensation of any employee under the provisions of the Federal and applicable state Income Tax Acts, the Federal Social Security Act, any applicable state unemployment insurance tax act, and/or any amendments thereof and/or any other applicable statutes heretofore or hereafter enacted requiring the withholding of any amount from the compensation of an employee, as a result solely of Lender providing my services under the Agreement.

F.  If Company shall serve Lender with any notices, demands or instruments relating to the Agreement, or to the rendition of my services thereunder, service upon Lender shall also constitute service upon me.

G.  For purposes of any and all workers' compensation statutes, laws, or regulations ("Workers'

DocuS gn Enve ope ID: FC586638-33F1-48FF-A2B2-DC2A74471EB1

compensation"), I acknowledge that an employment relationship exists between Company and myself, Company being my special employer under the Agreement.  Accordingly, I acknowledge that in the event of my injury, illness, disability, or death falling within the purview of Workers' compensation, my rights and remedies (and those of my heirs, executors, administrators, successors, and assigns) against Company or Company's affiliated companies and their respective officers, agents, and employees (including, without limitation, any other special employee and any corporation or other entity furnishing to Company or an affiliate company the services of any other special employee) shall be governed by and limited to those provided by Workers' compensation, but in no event shall I be treated less favorably than if I had been directly employed or engaged by Company.

DocuSigned by:

*Chad Darnell*

2DCD1F6E6302409...

CHADWICK DARNELL "DIRECTOR"



Directors Guild of America
7920 Sunset Blvd.
Los Angeles, CA 90046
(310) 289-2000
RCForms@dga.org

# MADE FOR NEW MEDIA
# DIRECTOR DEAL MEMORANDUM

This confirms our agreement to employ you to direct the covered made-for-New Media project described as follows
(and as referenced in Sideletter No. 35 of the BA and Sideletter No. 28 of the FLTTA):

## DIRECTOR INFORMATION:

Name: **Chadwick Max Darnell (Chad Darnell)**     SSN# (last 4 digits): _____

Loanout: **Mandra Pictures LLC**     FID. #: **46-2322953**

Address: **250 10th Street NE. #2419. Atlanta, GA 30309**

Phone#: **818-720-2915**     Email: **chaddarnell@gmail.com**

Your SALARY shall be $ **25000.00**     ☑ per project   ☐ per episode   ☐ per week   ☐ per day

Guaranteed Period of Employment (if any): _____

Start Date (on or about): **12-30-2019**

Other Conditions (including credit above the minimum): _____

_____

_____

## PROJECT INFORMATION:

Current Title of Project: **The Undertakers Wife**

☐ Episodic Series — Title of Episodes Directed: _____

_____

☑ Single Project — Total run time (minutes) (approximately, if known): _____

Project Type:   ☑ Dramatic   ☐ Variety   ☐ Quiz/Game Show   ☐ "All Other"   ☑ Other (specify) **Horror/Thriller**

## ACCEPTED AND AGREED:

The Employee hereby authorizes the Employer to deduct from his or her salary the amount specified in the Directors Guild of America Basic Agreement and/or Freelance Live and Tape Television Agreement as the Employee's contribution to the Directors Guild of America–Producer Pension Plan.  The Employer will pay the amount so deducted directly to the Pension Plan on the Employee's behalf.

Signatory Employer (Company Name): **Undertaker LLC**

Signatory Employer Representative Signature: _____

Date: **December 30, 2019**

Employee Signature: _____

Date: **December 30, 2019**

NewMed - DM-DIR

# EXHIBIT 3

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

# Screenplay Purchase Agreement

### *THE INTELLIGENT*

This agreement ("Agreement") is made and entered into as of February 13, 2021 ("Effective Date"), by and between DB Film LLC ("Producer") and Chadwick Darnell ("Owner") with respect to the unpublished, unexploited original screenplay entitled "The Intelligent" written by Owner.  Such work, and the title, themes, stories, dialogue and all of the other contents thereof, and the characters therein, and all translations, adaptations, and versions thereof, whether now existing or hereafter created, are herein referred to collectively as the "Property".  The first production based on the Property and produced pursuant to the rights granted herein shall be referred to as the "Picture". The parties hereto agree as follows:

1.  <u>CONDITIONS PRECEDENT</u>.   All of Owner's obligations hereunder are subject to Producer's payment to Owner of all non-contingent compensation and/or fees owed to Owner hereunder.  All of Producer's obligations hereunder are subject to satisfaction of the following conditions precedent ("Conditions Precedent"):

   a.  Signature by Owner and delivery to Producer of this Agreement;

   b.  Signature by Owner and delivery to Producer of the Short Form Assignment (attached hereto as Exhibit A).

   c.  Clear chain of title for the Picture in form and substance satisfactory to Producer in its sole discretion.

2.  <u>PURCHASE PRICE</u>. Owner hereby grants, sells and assigns to Producer all rights in the Property. Upon commencement of principal photography of the Picture, Producer shall pay Owner as full and complete consideration for all rights granted by Owner hereunder (including, without limitation, the Rights as defined in Section 4 below) and the promises, representations and warranties made by Owner, a sum of One United States Dollars ($1.00) (the "Purchase Price").

3.  <u>GRANT OF RIGHTS</u>. Owner hereby sells, grants, conveys and assigns to Producer exclusively and irrevocably in perpetuity and throughout the universe, all right, title and interest of every kind and nature, in and to the Property (and all marketing rights relating thereto) without reservation, claim or retained rights of any kind by Owner (all of the foregoing being collectively referred to as the "Rights"). Owner shall retain no rights of any kind or nature to the Property. Without limiting the generality of the foregoing, the Rights in the Property herein granted include:

   (a)  <u>Droit Moral/Rental and Lending Rights</u>: The right to change, add to, delete, take from, translate or otherwise modify the Property in any manner Producer may in its own discretion determine. Owner hereby waives the benefit of any provision of law known as "droit moral" or moral rights of authors or any similar or analogous law or decision in any country of the world.  Owner, on Owner's own behalf and on behalf of Owner's successors-in-interest, heirs, executors, administrators and assigns hereby assign to Producer in perpetuity all rental and

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

lending rights under national laws (whether implemented pursuant to the EC Rental and Lending Rights Directive or otherwise) to which Owner may now be or hereafter may become entitled therefrom.  Owner agrees, on Owner's own behalf and on behalf of Owner's successors-in-interest, heirs, executors, administrators and assigns, not to institute, support, maintain or permit, directly or indirectly, any litigation or proceedings instituted or maintained on the ground that Producer's (or its designee's) exercise of the right granted to Producer in the Picture in any way constitutes an infringement or violation of any such rental or lending right as aforesaid.  Owner hereby acknowledges that the consideration to which Producer is entitled pursuant to this Agreement includes consideration for the assignment of rental and lending rights provided for in this paragraph and that such consideration is an equitable and adequate part of the revenues derived or to be derived by Producer from such rights.  Further, if under any applicable law the above waiver or assignment by Owner of "moral rights" or "droit moral" is not effective, then Owner agrees to exercise such rights in a manner which recognizes the contribution of and will not have a material adverse effect upon such other parties.

(b)     <u>Name and Likeness</u>: Subject to the terms of this Paragraph, Producer shall have the right to use and permit others to use Owner's approved name, photograph, likeness and biography in connection with advertising, publicizing and exploiting Producer and the Picture and any allied and ancillary rights therein in all media now known or hereafter devised and in any manner, in segments or otherwise, at Producer's sole discretion, provided that Owner will not be represented as endorsing any such commodity, product, or service other than the Picture without Owner's prior consent (provided, however, that Producer shall not be required to obtain Owner's prior consent for the use of Owner's name in the billing block).  Owner shall have the right to submit to Producer a written biography and photographic likeness of Owner within five (5) business days, reducible to two (2) business days if Producer requires a shorter period of time and requests such in writing, of Producer's written request therefor, provided that if Owner fails to submit a written biography and/or photographic likeness within such five (5) business day time period, reducible to two (2) business days if Producer requires a shorter period of time and requests such in writing, then Owner does not have the right to submit and/or approve any factual, accurate biography and/or photographic likeness used by Producer.

(c)     <u>Institution of Legal Action</u>: The free and unrestricted right, exercisable at Producer's cost and expense, to institute in the name of and on behalf of Owner, suits and proceedings at law or in equity to enjoin and restrain any infringement(s) of the rights herein granted; Owner hereby assigns to Producer any and all causes of action arising from any such infringement(s) and any and all recoveries obtained in any such action. Owner will not compromise, settle or in any manner interfere with any such litigation. Producer shall furnish Owner with copies of any documents and notices hereunder; provided, that any inadvertent failure to do so shall not be deemed to be a breach of this Agreement.

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

(d)     Nothing contained in this Agreement shall be construed as requiring Producer to exercise or exploit, or continue to exercise or exploit, any of the rights herein granted or to maximize revenues.

(e)     The Rights herein granted are in addition to, and this Agreement shall in no way limit, the rights with respect to the Property or the subject matter thereof which Producer or its assignees may now or hereafter enjoy as a member of the general public.

(f)     All rights granted and agreed to be granted to Producer under this Agreement shall be irrevocably vested in Producer in perpetuity, including, without limitation, for the full term of copyright protection everywhere in the world and in any and all renewals, extensions and revivals thereof.  As a material part of the consideration moving to Producer for its execution of this Agreement, Owner agrees that in the event the termination of transfer provisions of Section 203 of the United States Copyright Act shall be applicable prior to the termination of Producer's rights hereunder, and/or if Owner otherwise becomes entitled to exercise any right of reversion or recapture (the "Recapture Rights"), Producer shall have a right of first negotiation and right of last refusal with respect to the renewal of the rights granted to Producer hereunder.  If Owner fails to do any of the things specified in this paragraph, Producer is hereby irrevocably granted the power coupled with any interest to perform such acts and take such proceedings in the name and on behalf of Owner as its attorney-in-fact.

4.      PASSIVE PAYMENTS. If the Picture is released and if Producer, or its assignee, licensee, or designee, elects, in its sole discretion, to produce a Subsequent Production, and if Owner does not render writing services on the respective Subsequent Production and Owner receives sole writing credit and sole separation of rights pursuant to WGA rules and regulations, then, upon commencement of principal photography of each such Subsequent Production, Owner shall receive the following:

(a)     Theatrical Sequel/Prequel.  An amount equal to one-half (1/2) of the Purchase Price and back-end participation actually paid to Owner pursuant to Section 3 above and the Profit Participation Rider, payable on or before the first day of principal photography on such sequel/prequel.

(b)     Theatrical Remake.  An amount equal to one-third (1/3) of the Purchase Price and back-end participation actually paid to Owner pursuant to Section 3 above and the Profit Participation Rider, payable on or before the first day of principal photography on such remake(s).

(c)     Television Series.  For each pilot or episode of a TV series:

    i.  If intended for initial broadcast on U.S. primetime network free television (i.e.,

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

ABC, CBS, CW, NBC or Fox), the following royalties ("TV Network Amount") upon commencement of principal photography thereof:

1. Up to 30 minutes: Two Thousand One Hundred Seventy-Two United States Dollars (US$2,172.00) for each episode.

2. More than 30 minutes, up to 60 minutes: Four Thousand One Hundred Twenty-Seven United States Dollars (US$4,127.00) for each episode.

3. More than 60 minutes: Five Thousand Four Hundred Thirty United States Dollars (US$5,430.00) for each episode.

ii. If intended for initial broadcast on premium cable (i.e., Showtime, Starz or HBO) or Premium SVOD (i.e., Netflix, Hulu or Amazon), a sum equal to Seventy-Five Percent (75%) of the TV Network Amount.

iii. If intended for initial broadcast on basic cable, a sum equal to Fifty Percent (50%) of the TV Network Amount.

iv. Reruns:  Twenty Percent (20%) of the applicable royalty shall be payable for each of the first five (5) television exhibitions in the United States or Canada after the first run.

(g)    Movies-of-the-Week and Television Mini-Series.  For each movie-of-the-week or television mini-series primarily intended for initial U.S. television or streaming exhibition, $10,000 for each hour, but not more than $100,000 in aggregate.

(h)    100/50/50: If an episode produced under subparagraph (c) is initially released theatrically in the U.S., an additional sum equal to One Hundred Percent (100%) of the royalty under the applicable subparagraph; if theatrically released outside the U.S., an additional Fifty Percent (50%) of the applicable royalty; and if theatrically released in the U.S. following its first television broadcast in U.S., an additional Fifty Percent (50%) of the applicable royalty. Notwithstanding the foregoing, for purposes of determining the additional sum due Owner for an episode produced under subparagraph (c), the royalty shall be calculated based on the length of the episode as theatrically released.

(i)    Spinoff Series Royalties:

i. Owner shall receive Fifty Percent (50%) of the applicable royalties set forth in Sections 6(c)(i) to 6(c)(iii) in connection with any so-called generic television spinoff series.

ii. Owner shall receive Twenty-Five Percent (25%) of the applicable royalties set

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

forth in Sections 6(c)(i) to 6(c)(iii) in connection with any so-called planted television spinoff series.

(j)     In the event any of the amounts payable to Owner pursuant to this Section 6 are greater than the minimum amounts payable under the WGA MBA (as defined below) for the applicable subsequent productions (the "Minimum Scale Amounts"), then, such amounts as expressly set forth herein shall be paid in lieu of the Minimum Scale Amounts, and not in addition thereto.  In the event the amounts payable to Owner under this Section 6 are less than the applicable Minimum Scale Amounts, then only such amounts as actually received by Writer hereunder shall be credited against the Minimum Scale Amounts to be paid to Owner, as applicable.

(k)     In the event Owner receives shared credit on the Picture and/or shared separation of rights, then the applicable passive participation payments otherwise payable to Owner set forth herein shall be reduced by one-half (1/2).

5.    <u>REVERSION OF RIGHTS</u>.  In the event that Producer does not commence principal photography on the Picture within five (5) years following payment of the Purchase Price, (the "Reversion Date"), then all rights shall revert to Owner (the "Reversion"); provided that any reversion to Owner shall be subject to a repayment obligation in an amount equal to any and all actual, verifiable, out of pocket expenses and costs incurred by Producer in connection with the Property, including without limitation, all compensation paid by Producer to Owner hereunder, plus interest equal to the prime rate of Producer's bank from time to time in effect plus 2% (accruing as of the Reversion Date) (collectively, the "Turnaround Fee"). The Turnaround Fee shall be secured by a first priority lien (subordinate only to applicable guild's security interest) on the rights granted hereunder in favor of Producer. In accordance with the foregoing, in the event of a Reversion, Owner shall execute, acknowledge and deliver to Producer following a reasonable opportunity to review and comment thereon, not to exceed five (5) business days, reducible to two (2) business days if Producer requires a short period of time and requests such in writing, for Producer's written request therefor, upon the Reversion Date, and at such times thereafter as Producer may in its reasonable discretion require, all such notices, mortgages, mortgages and assignments of copyright, financing statements, continuation statements, security agreements, assignments, transfers and other documents and instruments as Producer shall reasonably require to further evidence, perfect, effect, protect and/or enforce its security interest.  Without limiting the foregoing in any manner, Owner hereby authorizes Producer to file any and all financing statements under the Uniform Commercial Code of the State of California, and/or any other applicable states, and amendments thereto. The Turnaround Fee shall be payable to Producer (or Producer's assignee or designee) on commencement of principal photography of any audiovisual production based on the Property.

6.    <u>REPRESENTATIONS AND WARRANTIES</u>. Subject to Article 28 of the WGA MBA, Owner hereby represents and warrants that, to the best of Owner's reasonable knowledge and belief: (a) the Property was written solely by and is original with Owner; (b) neither the Property nor any element thereof infringes upon any other literary property; (c) subject to the exclusion of any material created or otherwise added by Producer or any other party, the production or

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

exploitation of any motion picture or other production based on the Property will not violate the rights to privacy of any person or constitute a defamation against any person, nor will production or exploitation of any motion picture or other production based thereon in any other way violate the rights of any person; (d) Owner owns all rights in the Property as specified herein above free and clear of any liens, encumbrances, claims or litigation, whether pending or threatened; (e) Owner has full right and power to make and perform this agreement; (f) the Property has not previously been exploited as a motion picture, television production, play or otherwise than in book form, and no rights have been granted to any third party to do so; and (g) there are no claims, litigation or other proceedings pending or threatened which could impair, limit, diminish or infringe upon the Rights.  Owner has not and will not at any time enter into any agreement which conflicts in any way with this Agreement or undertake or permit activities which will interfere with, diminish or compete with the exercise of any of the Rights, or attempt to sell, license, assign, dispose of or encumber any of the Rights.

7.   <u>INDEMNIFICATION</u>.

   (a)   <u>Owner</u>: Owner will at all times indemnify and hold Producer, its affiliates and their respective officers, directors, agents, shareholders and employees and Producer's licensees, distributors, successors and assigns, harmless from and against all third party claims, demands, suits, liabilities, judgments, settlements, losses, costs, damage and expenses, including without limitation reasonable outside attorneys' fees, whether or not in connection with litigation (collectively, "Claims"), arising out of or in connection with any uncured material breach by Owner of any representation, warranty or agreement made or entered into herein or hereunder by Owner.

   (b)   <u>Producer</u>: Producer will at all times defend, indemnify and hold Owner and its successors and permitted assigns harmless from and against all Claims arising out of or in connection with (a) any uncured material breach by Producer of any representation, warranty or agreement made or entered into herein or hereunder by Producer; (b) any third party material added to the Property by Producer or its assignees or at their direction; or (c) the development, production, marketing or exploitation of the Picture and all elements thereof and ancillary rights thereto, except to the extent such Claims are based upon, derived from or related to any uncured material breach by Owner hereunder.

8.   <u>TRANSPORTATION AND EXPENSES</u>:  If Producer requires either or both Owner to perform services at a location more than fifty (50) miles away from Owner's (as applicable) principal residence, which is Los Angeles, California (the "Principal Residence"), then at all times subject to the Producer-approved budget for the Picture, on a most favored nations basis with all other non-cast above the line individuals:

   (a)   <u>Air Transportation</u>:  Producer shall furnish either or both Owner (as applicable) with business-class round-trip transportation by air to and from such location. If Owner is required at such a location for fourteen (14) consecutive days or more, one (1) additional coach-class transportation (if available, and also if

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

used) to and from such location for Owner's spouse or non-business-related companion on a one (1) time basis only.

(b)    <u>Accommodations/Per Diem</u>:  Producer shall furnish either or both Owner (as applicable) with a hotel or similar accommodations, not less favorable than that furnished to any non-cast individual.

(c)    <u>Ground Transportation</u>: Producer shall provide either or both Owner (as applicable) with exclusive ground transportation to and from airports, Owner's Principal Residence and Owner's overnight accommodations set forth in subparagraph (b) above.

(d)    <u>Rental Car</u>: Either or both Owner (as applicable) shall be furnished with an insured rental car, and reimburse Owner for gas expenses incurred by Owner related to work covered herein.

9.    <u>ADDITIONAL DOCUMENTS</u>. Owner agrees to execute at Producer's reasonable request any and all additional documents or instruments consistent herewith, including but not limited to the short form assignment for purposes of recording in the United States Copyright Office (Exhibit A), and to do any and all things reasonably necessary or desirable to effectuate the purposes of this agreement. If such short form assignment is undated, Producer is authorized to date such short form assignment and to file the same in the Copyright Office immediately upon execution thereof. If Owner fails to do anything necessary or desirable to effectuate the purposes of this Agreement, including, but not limited to, renewing copyrights and instituting and maintaining actions for infringement of any rights herein granted to Producer under copyright or otherwise, after a reasonable opportunity to review and comment (not to exceed five [5] days from Producer's request therefor), Owner hereby irrevocably appoints Producer as Owner's attorney-in-fact with the right, but not the obligation, to do any such things and renew copyrights and institute and maintain actions in Owner's name and behalf, but for Producer's benefit, which appointment shall be coupled with an interest and shall be irrevocable. Producer shall provide Owner with a copy of any document and/or instrument so executed in Owner's name, provided that Producer's inadvertent failure to do so shall not affect the validity thereof.

10.    <u>SCREENPLAY CREDIT</u>. Producer, or its assignee, shall accord Owner credit in connection with the Picture. No casual or inadvertent failure by Producer, nor the failure by any third party, to accord the credit provided for in this Section shall be deemed a breach of this Agreement provided, however, that upon Owner's written notice to Producer of a material failure to accord such credit, Producer shall use reasonable efforts to cure such failure on a prospective basis with respect to prints not yet issued or ads not yet prepared. Producer shall contractually bind the domestic distributor of the Picture and use good faith efforts advise all direct third party licensees of its credit obligations hereunder.

11.    <u>ASSIGNMENT</u>.  Producer shall have the right to assign this agreement or any part hereof only to a financially responsible party upon the terms and conditions set forth in this agreement, and any such assignment and transfer shall be made specifically subject to the terms and conditions and payments of this agreement, regardless of whether or not Producer becomes or remains involved in the production of the Property. Producer shall remain secondarily liable to this

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

Agreement in the event of an assignment, unless such assignment is to a major or mini-major studio or a major television network, and that entity accepts all of Producer's obligations in writing. Owner may not assign this agreement (except for the limited right to assign Owner's rights to receive monetary payments provided to Owner by this Agreement).

12.     <u>BLU-RAY</u>:  Upon written request by Owner, Producer shall provide Owner each with one (1) DVD or Blu-Ray copy of the Picture, if and when such DVD or Blu-Rays of the Picture are commercially available, pursuant to and subject to the terms and conditions of any applicable distributor's DVD and/or Blu-Ray distribution policies and practices.

13.     <u>PREMIERES/SCREENINGS</u>: Provided that Owner is not in uncured material breach of this Agreement, then each Owner, and three (3) guests of such Owner, shall be invited to attend all major United States "celebrity" premieres of the Picture and major festival showings of the Picture.

14.     <u>NOTICES</u>: All notices pursuant to this Agreement shall be given in writing and delivered as follows: (a) in person; (b) by certified U.S. Mail, return receipt requested; or (c) by recognized courier or messenger service that provides proof of delivery (e.g., FedEx, UPS).  Date of service of such notice shall be the date of delivery. Notice by e-mail shall only be effective if acknowledged in writing by the recipient (or by recipient's authorized representative).  Payments and written notices may be delivered to the parties as follows:

OWNER:
Chadwick Darnell
250 10th Street NE #2419
Atlanta, GA 30309

PRODUCER:
c/o Ramo Law PC
315 S Beverly Dr., Ste. 210
Beverly Hills, CA 90212
Attn: Michelle Chang

15.     <u>REMEDIES</u>. Provided Producer has paid the Purchase Price, Producer shall be entitled to seek injunctive and other equitable relief to prevent any breach of this Agreement by Owner and to secure the enforcement of this Agreement. The rights and remedies of Owner in the event of a breach of this Agreement by Producer are limited to money damages, if any, and under no circumstances shall Owner be entitled to terminate or rescind this Agreement or enjoin, restrain or in any way interfere with the distribution, exhibition, or exploitation of the Picture, and the rights therein, or the use, publication, dissemination or any advertising issued in connection therewith and Owner irrevocably waives any right to equitable or injunctive relief. Producer's rights and remedies shall be cumulative, and the exercise by Producer of one or more of such rights or remedies shall not preclude Producer's exercise of any other right or remedy, at law, or in equity.

16.     <u>PUBLICITY</u>. Unless first approved in writing by Producer, Owner shall not issue or

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

authorize the publication of any news stories or articles, books or other publicity (including but not limited to blogs and social media networking services) relating directly or indirectly, to the subject matter of this Agreement, the Picture, or the services to be rendered by others in connection with the Picture, or make any derogatory, knowingly false statements relating to the subject matter of this Agreement, the Picture, or the services to rendered by others in connection with the Picture, except personal publicity in which the Picture and/or such production, as applicable, is only incidentally, non-derogatorily mentioned following the initial Producer authorized press release for the Pictures.  Producer shall have the sole authority to regulate activities on set. Owner shall not have the right to bring any individual on set or to photograph or film any sets, individuals or activities without the prior written approval of Producer.  Without in any way limiting the foregoing, Owner's original version of the Property may be shared with third parties as part of Owner's professional portfolio, provided that Owner gives three (3) business days' advance written notice, naming the party(ies) with whom Owner wishes to share Owner's original version of the Property, for Producer to approve or deny Owner's request, provided that Producer will not unreasonably deny any such request by Owner; Producer's failure to object or respond to Owner's notice shall be deemed acceptance by Producer.

17.    <u>ADDITIONAL INSURED</u>. Producer shall add Owner as an additional insured under the errors and omissions and general liability insurance policies with respect to the Picture, if any, subject to the terms and conditions and restrictions of said policies, including any deductible or policy limits; provided, however, that (a) the inclusion of Owner on such policies will not relieve Owner in any way whatsoever from Owner's representations, warranties and indemnities contained herein; and (b) the foregoing shall not be construed to provide for any waiver of the insurance company's right of subrogation.

18.    <u>DISPUTE RESOLUTION</u>: All disputes shall be submitted to confidential final and binding arbitration. The arbitration shall be initiated and conducted according to either the JAMS Streamlined (for claims under $250,000) or the JAMS Comprehensive (for claims over $250,000) Arbitration Rules and Procedures, except that the prevailing party in such arbitration proceeding shall be entitled to reimbursement of its reasonable outside attorneys' fees and costs (including, without limitation, in connection with any arbitration), at the JAMS office located in Los Angeles County, or its successor ("JAMS") in effect at the time the request for arbitration is made (the "Arbitration Rules"). The arbitration shall be conducted in Los Angeles County before a single, mutually approved, neutral arbitrator who shall be an attorney or retired judge with at least ten (10) years' experience in the motion picture industry. The arbitrator shall follow arbitration laws of the State of California in adjudicating the dispute. The parties waive the right to seek punitive damages and the arbitrator shall have no authority to award such damages. The arbitrator will provide a detailed written statement of decision, which will be part of the arbitration award and admissible in any judicial proceeding to confirm, correct or vacate the award. Any award shall be final, binding, and non-appealable. Each party hereby irrevocably submits to the jurisdiction of the state and federal courts for the County of Los Angeles in connection with any petition to confirm an arbitration award obtained pursuant to this Paragraph. The party seeking enforcement shall be entitled to an award of all costs, fees and expenses, including reasonable, outside attorneys' fees, incurred in enforcing the award, to be paid by the party against whom enforcement is ordered.  The arbitration will be confidential and conducted in private, and will not be open to the public or media.  Except in connection with any petition to confirm the arbitration award, no matter relating

DocuSign Envelope ID: 4CE32775-5F1C-48D4-A5CD-3A8BB41BDF79

to the arbitration (including, but not limited to, the testimony, evidence or result) may be: (i) made public in any manner or form (ii) reported to any news agency or publisher; or (iii) disclosed to any third party not involved in the arbitration. For purposes of clarity, any credit-related disputes shall be resolved per the provisions of Section 14 above.

19.    <u>MISCELLANEOUS</u>. This Agreement shall be subject to and construed in accordance with the laws of the State of California applicable to agreements which are executed and fully performed therein. Except as expressly provided to the contrary herein, each provision of this Agreement shall be considered separate, and in the event that any provision is held invalid or unenforceable by a court of competent jurisdiction, the remaining provisions shall continue in full force and effect. Any Dispute or part thereof, or any claim for a particular form of relief (not otherwise precluded by any other provision of this Agreement), that may not be arbitrated pursuant to applicable law may be heard only in a court of competent jurisdiction in Los Angeles County.  The parties hereby submit to the exclusive jurisdiction and venue of the local, state and federal courts located in Los Angeles County. Nothing contained herein shall constitute a partnership between or joint venture by the parties or constitute either party as the agent of the other. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which taken together shall constitute one and the same instrument, respectively. Executed copies of the signature pages of this Agreement sent by facsimile or transmitted electronically in either tagged image format files (TIFF) or portable document format (PDF) shall be treated as originals, fully binding and with full legal force and effect, and the parties waive any rights they may have to object to such treatment. This Agreement constitutes the entire agreement between the parties and cannot be modified, supplemented or amended except by written instrument executed by the parties and supersedes and cancels all other and former agreements and understandings in the premises between the parties as of the date hereof. The waiver by either party of any breach of this Agreement shall not constitute a waiver of any subsequent breach. Any waiver must be in writing to be effective. Headings are for the ease of reference only, and shall not be given any weight in interpreting this Agreement. No officer, employee or representative of Producer has any authority to make any representation or promise in connection with the Agreement or the subject matter hereof which is not contained herein, and Owner agrees that Owner has not executed the Agreement in reliance upon any such representation or promise.

*(signature page to follow)*